**COMMONWEALTH BANK & TRUST COMPANY, N.A., Executor, Estates of Frank N. Lent and Betty J. Lent, Appellants,**

v.

**Dale "Bill" RUSSELL, Sheriff; and Potter County Commissioners.**

No. 86–5915.

United States Court of Appeals, Third Circuit.

Argued July 16, 1987.

Decided Aug. 10, 1987.

William A. Hebe, Spencer, Gleason & Hebe, Wellsboro, Pa., for appellee Dale "Bill" Russell, Sheriff.

C. Edward S. Mitchell (argued), Mitchell, Mitchell & Gray, Williamsport, Pa., for appellee Potter County Com'rs.

Robert H. Vesely (argued), John M. Humphrey, Rieders, Travis, Mussina, Humphrey & Harris, Williamsport, Pa., for appellants.

Before SLOVITER and STAPLETON, Circuit Judges, and SHAPIRO, District Judge.*

SLOVITER, Circuit Judge.

Commonwealth Bank & Trust Company, N.A., the executor of the estate of Frank and Betty Lent, appeals from the order of the district court dismissing its claim brought under 42 U.S.C. § 1983 alleging that the Lents, who were murdered by an escaped prisoner, were deprived of their constitutional rights through the actions of the defendant prison and county officials.

* Honorable Norma L. Shapiro, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## I.

### *FACTS*

In reviewing the dismissal of a complaint pursuant to Fed.R.Civ.P. 12(b)(6), we must construe the complaint most favorably to the plaintiff and accept as true all the well-pleaded allegations therein. The complaint alleges that the Lents were residents of Potter County; that Elmer Slingerland, a prisoner, was confined in the Potter County Jail on July 22, 1985 on charges of homicide, burglary, robbery and theft in the April 15, 1985 murder of a Potter County resident who had been shot several times; that Slingerland was being held on $250,000 bail; that sometime in the evening on July 24, 1985 two turnkeys and other agents of the Potter County jail supervised recreation in the jail yard and that when the prisoners were returned to their cells no head count was conducted; that it was the policy of the jail not to take counts because of a series of inoperable locks in the cell block area; and that on the morning of July 25, 1985 employees of the jail discovered that Slingerland had escaped.

A ladder from the recreation yard had been placed inside one of the exterior walls of the jail. The complaint alleges that Slingerland used the ladder "as well as the deteriorating condition of the wall," trees outside the wall, and horseshoes from the recreation yard to scale the wall and descend to the street outside the jail or in the alternative that he used unsecured access to windows and the roof of the jail and then scaled the interior aspect and top of the jail wall to escape. App. at 9–10. According to the complaint, after escaping, Slingerland stole a handgun from a Potter County farm home and used that handgun in the shooting deaths of the Lents.

The complaint alleges that defendants Dale "Bill" Russell, the Potter County sheriff, and the Potter County Commissioners [1] knew or should have known that deficiencies in the internal locking mechanisms

of the jail, deficiencies in other portions of the jail including the jail wall and adjacent trees external to the wall and deficiencies in the training and supervision of the jail's turnkeys could lead to the injuries suffered by the Lents; that "municipal officials did have knowledge of inadequate jail conditions and security since Pennsylvania Department of Corrections Reports regularly faulted the facility and procedures at the Potter County Jail"; that defendants failed to remedy the deficiencies, institute proper correctional procedures and train and supervise jail employees; and that defendants' failure to act constituted "gross negligence, reckless indifference, and wilful neglect" of the rights of the Lents. App. at 12–13. The complaint alleges that the acts or omissions of the defendants who are supervisory municipal officials constituted an official policy which resulted in the Lents' deaths and that, since Slingerland, the person whose affirmative conduct caused the harm, was under the direct control or supervision of the defendants, the Lents' death can be attributed to them. App. at 12.

Count I of the complaint alleges a claim under § 1983 for loss of the Lents' "liberty interest in their expectation of continuing life and property interest in the ownership, use and continued enjoyment of their real and personal property" in violation of their rights under the Fourteenth Amendment. App. at 11. Counts II, III and IV allege state claims.

The district court dismissed the § 1983 claim pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The court, relying on *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), held that Slingerland was not an agent of the state, that the defendants had no reason to believe that the Lents were in any greater danger than the public at large, and that there was no "special relationship" be-

---

**1.** The Potter County Board of View was also named as a defendant. Plaintiff's counsel informed the court at oral argument that a Board of View was never appointed in Potter County. The docket sheet indicates that the Board filed a motion to dismiss. Plaintiff's counsel advised us that the complaint against the Board was withdrawn. In view of our disposition, it is unnecessary for us to resolve the Board's status.

tween Potter County and the Lents which created an affirmative duty of care and protection. App. at 33–37. The district court also dismissed the pendent state law claims. Plaintiff appeals.

## II.

### Discussion

The complaint adequately alleges that the defendants were acting under color of state law, *see Riley v. Jeffes,* 777 F.2d 143, 145 (3d Cir.1985), that the Lents were deprived of interests in life and property, *id.,* and that the defendants acted with the reckless indifference or callous disregard that will support a claim of violation of the Fourteenth Amendment under § 1983. *See Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986), *aff'g Davidson v. O'Lone,* 752 F.2d 817, 828 (3d Cir.1984) (in banc). The facts alleged, however, implicate yet another requirement of § 1983, i.e. that the constitutional deprivation alleged be fairly attributable to defendants' conduct. As the district court recognized, the starting point for consideration of this issue is the Supreme Court's decision in *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980).

In *Martinez,* a 15 year old girl was tortured and then murdered by a parolee five months after his release from prison. The parolee, who had been convicted of rape, was committed initially to a state mental hospital as a "Mentally Disordered Sex Offender not amenable to treatment" and thereafter sentenced to a term of imprisonment of 1 to 20 years, with a recommendation that he not be paroled. He was paroled five years later notwithstanding that, according to the complaint, parole officials were fully informed of his dangerous propensities and the likelihood that he would commit another violent crime. 444 U.S. at 279, 100 S.Ct. at 556. The California courts sustained a demurrer to the complaint.

The Supreme Court affirmed, holding that the plaintiffs "have not alleged a claim for relief under Federal law." *Id.* The Court concluded that "taking these particu-

lar allegations as true, the [state officials] did not deprive [plaintiffs'] decedent of life within the meaning of the Fourteenth Amendment." *Id.* at 285, 100 S.Ct. at 559. The Court stated its reasoning briefly:

Her life was taken by the parolee five months after his release. He was in no sense an agent of the parole board. Cf. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Further, the parole board was not aware that [plaintiffs'] decedent, as distinguished from the public at large, faced any special danger. We need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner on parole. But we do hold that at least under the particular circumstances of this parole decision, [plaintiffs'] decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law. Although a § 1983 claim has been described as "a species of tort liability," *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128, it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute.

*Id.* (footnotes omitted).

Since *Martinez,* the courts have dismissed § 1983 claims against state officials for injuries or deaths caused by parolees or released criminals. For example, *Fox v. Custis,* 712 F.2d 84 (4th Cir.1983), involved a § 1983 suit by three female plaintiffs who were raped, beaten, shot, stabbed and set on fire by a parolee. The complaint alleged that the parole board and parole officers continued the parolee on parole despite their knowledge that the parolee was convicted for defrauding an innkeeper three weeks after his release and despite their suspicion that shortly after the parolee's release he had committed an act of arson which resulted in a woman's death. The dismissal of the complaint was affirmed on the ground that no special relationship existed between the plaintiffs and the state officials which gave rise to an

affirmative duty of protection. The court found that "[t]he claimants here were simply members of the general public, living in the free society, and having no special custodial or other relationship with the state.... [T]he state agent defendants here were 'unaware that the [claimants] as distinguished from the public at large faced any special danger.'" *Id.* at 88 (quoting *Martinez*, 444 U.S. at 285, 100 S.Ct. at 559).

Similarly, in *Humann v. Wilson*, 696 F.2d 783 (10th Cir.1983) (per curiam), the court affirmed the dismissal of a complaint in a suit brought by a victim who had been raped by an inmate of a community corrections facility which permitted a good deal of freedom and interaction in the community. Relying on *Martinez*, the court concluded that there was no special relationship alleged.

Other courts have reached similar results. *See Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir.1986) (no cause of action stated where parolee, who had made threats against a police officer's wife and had violated parole by failing to report to parole officer, murdered someone who was "simply a member of the public at large"); *Bowers v. DeVito*, 686 F.2d 616, 618–19 (7th Cir.1982) (affirming summary judgment for defendants in a suit based on a murder committed by an offender released from mental health center where he had been committed after being found not guilty by reason of insanity for earlier murder).

In a recent case presenting facts similar to this one, an inmate of a minimum security facility who was being held for an alleged parole violation and was awaiting trial on burglary escaped from the facility and, two months later, raped the plaintiff. Her § 1983 suit against the county, the county Board of Supervisors, and other county officials was dismissed because, *inter alia,* the court found that no special relationship existed between plaintiff and the officials. *Ketchum v. County of Alameda*, 811 F.2d 1243, 1245–47 (9th Cir. 1987). The *Bowers* court accurately summarized the general state of the applicable

law when it stated that there was no deprivation actionable under § 1983 because "[T]he defendants in this case did not place [plaintiff's decedent] in a place or position of danger; they simply failed adequately to protect her, as a member of the public, from a dangerous man." 686 F.2d at 618.

Some courts have held that even where the defendants are aware of a risk of harm to a particular individual, no § 1983 claim is stated against the officials if the released prisoner caused that harm. *Estate of Gilmore v. Buckley*, 787 F.2d 714, 721 (1st Cir.) (plaintiff's decedent was murdered by a man who had previously threatened her life and had been hospitalized for mental evaluation as a result of her complaints), *cert. denied,* —— U.S. ——, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986). *See also Jones v. Phyfer*, 761 F.2d 642 (11th Cir. 1985) (finding no special relationship where furloughed prisoner raped plaintiff who was instrumental in his prior conviction for breaking and entering her home).

We need not decide whether we would adopt a similarly restrictive view when there is knowledge of potential harm by a parolee to a particular individual. District courts in this circuit have held that such knowledge is enough to permit maintenance of the action. *See Hardman v. County of Lehigh*, 613 F.Supp. 649, 652–53 (E.D.Pa.1985) (cause of action stated where prisoner on furlough attacked plaintiff and plaintiff's minor child, and prison officials had been informed by plaintiff that prisoner had harassed and threatened plaintiff, and had broken window of plaintiff's home two days earlier while on work release); *see also Dudosh v. City of Allentown*, 629 F.Supp. 849, 853–55 (E.D.Pa.1985) (cause of action stated where plaintiff's decedent repeatedly requested police assistance, had obtained protection-from-abuse order against her assailant who threatened her life and had previously beaten her, and police, in answering request for assistance, instructed plaintiff's decedent to enter residence where they knew assailant to be). Here the defendants had no knowledge of danger peculiar to the Lents, as distinguished from other members of the general public. Moreover, since the prisoner es-

caped, the causal nexus to defendants' actions is even more attenuated than in cases where the perpetrator of the subsequent crime has been intentionally released.

Plaintiff argues that defendants' maintenance of the jail in a condition which made escape likely and the placement of Slingerland, a particularly dangerous prisoner, in that jail when it was in an unsafe condition created a situation that posed an immediate threat to the life and safety of individuals, such as the Lents, who resided in the community surrounding the jail. Plaintiff makes a sympathetic argument. It must fail because the residents in the communities surrounding the jail are part of the "public at large", referred to in *Martinez*, 444 U.S. at 285, 100 S.Ct. at 559. They cannot reasonably be characterized as individuals who defendants knew "faced any special danger." *Id.* Nor do we believe that the brief interval between the escape and the crime in this case is sufficient to distinguish it from *Martinez* where five months elapsed after release before the crime was committed. We read *Martinez* as holding that the key element that was missing was a causal nexus, the same element we find missing here.

Of course, as the Supreme Court itself noted in *Martinez*, cases "where local law enforcement officials themselves beat a citizen to death," *id.* at 285 n. 10, 100 S.Ct. at 559 n. 10 (citing *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)), are not comparable to the situation presented here. Cases where the harm is directly inflicted by officials acting under color of state law present the archetypical circumstances for which § 1983 was enacted. It is clear, however, that § 1983 is not limited to cases of direct harm inflicted by state officials. This is suggested by the distinction made in *Martinez* between that victim there and those who the authorities knew face a "special danger".

None of the categories of cases finding a "special danger" or "special relationship" since the *Martinez* decision is relevant here. A prisoner is, by virtue of his or her custody, in a special relationship with the custodial authorities and dependent upon them for protection. If the authorities recklessly disregard the prisoner's safety, they may be liable under § 1983 for acts performed by another inmate. *Davidson v. O'Lone*, 752 F.2d at 821–22, 828. Patients committed to a public hospital are in a comparable special relationship. *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982). *Cf. Partridge v. Two Unknown Police Officers of Houston*, 791 F.2d 1182, 1187 n. 20 (5th Cir.1986) (duty arising out of custodial relationship extends to the need for protection from one's own suicide).

We have also held that yet another special relationship arises between a state agency having responsibility to protect abused children and those children. *See Estate of Bailey v. County of York*, 768 F.2d 503, 508–11 (3d Cir.1985); *see also Jensen v. Conrad*, 747 F.2d 185, 191–94 (4th Cir.1984) (suggesting that special relationship and hence cause of action might exist against state agencies which failed to intervene to prevent beatings of children by their guardians), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985); *cf. Doe v. New York City Department of Social Services*, 649 F.2d 134, 141–45 (2d Cir.1981) (*Doe I*). Plaintiff relies on *Bailey*, arguing that the facts here are comparable. We do not agree. In *Bailey*, the complaint alleged that the agency, which had notice of child abuse, took the child in its custody, received information confirming the child abuse, was aware of the source of the abuse, temporarily placed the child in protective custody, and returned her to her mother's care without adequately investigating the whereabouts of the child, her mother, or the mother's paramour who had previously abused the child. 768 F.2d at 510. This case is distinguishable from *Bailey* in the significant fact that defendants here were unaware of any particular threat to the Lents such as was posed to the child in *Bailey*, who had actually been in the custody of the county officials and replaced by them in a position of danger.

No authority supports extending § 1983 as far as plaintiff seeks. The recent case referred to us by plaintiff, *Nishiyama v.*

*Dickson County, Tennessee,* 814 F.2d 277 (6th Cir.1987) (in banc), is not comparable. In that case the murder on which the § 1983 suit was based was committed by a convicted felon who was put on "trusty" status by the sheriff and his deputies and was permitted to use a sheriff's department patrol car without supervision. Furthermore, the sheriff's department officials were advised that the felon was using the car to stop people and did nothing for 10 hours to prevent these actions. While driving that patrol car the felon directed the victim to pull over to the side of the road and, when she obeyed, beat her to death. In that case, because the officials gave the felon the instrumentality of law enforcement which enabled him to commit the offense, the Sixth Circuit held the complaint stated a claim. The court found that the cases we cite above were inapplicable because "in none of [those] cases did the state officers by their acts facilitate the crime by providing the criminal with the necessary means and the specific opportunity to commit his crime." *Id.* at 281.

In this case the tragic consequences of Slingerland's escape cannot reasonably be attributed to the county officials. Although one might argue that the county officials' gross negligence or reckless indifference with respect to the conditions of the jail were a contributing factor in the eventual murder of the Lents, they were too remote a cause to permit maintenance of this § 1983 law suit.

### III.

### *Conclusion*

For the foregoing reasons, we will affirm the order of the district court dismissing the complaint.