856 F.2d 594
 49 Ed. Law Rep. 44
 Kathleen STONEKING
v.
BRADFORD AREA SCHOOL DISTRICT, Frederick Smith, in his
individual and official capacity as principal of the
Bradford Area High School; Richard Miller, in his
individual and official capacity as assistant principal of
the Bradford Area High School; and Frederick Shuey, in his
individual and official capacity as Superintendent of the
Bradford Area School District.
Appeal of Frederick SMITH, Richard Miller and Frederick Shuey.
 No. 87-3637.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 3, 1988.
Decided Sept. 12, 1988.
 
 Kenneth D. Chestek (argued), Murphy, Taylor & Adams, P.C., James D. McDonald, McDonald Law Group, Erie Pa., for appellants.
 Deborah W. Babcox (argued), Pecora, Duke & Babcox, Bradford, Pa., Wallace J. Knox, Sean J. McLaughlin, Knox Graham McLaughlin Gornall and Sennett, Inc., Erie, Pa., for appellee.
 Before SLOVITER, STAPLETON, and MANSMANN, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 Facts
 
 1
 This is an appeal by the individual defendants from the district court's order denying their motion for summary judgment on the grounds of qualified immunity in an action brought under 42 U.S.C. Sec. 1983 (1982). We have jurisdiction of this appeal under 28 U.S.C. Sec. 1291 (1982). See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817-18, 86 L.Ed.2d 411 (1985); Hynson v. City of Chester, 827 F.2d 932, 933 (3d Cir.1987), cert. denied, 108 S.Ct. 702 (1988). Our review of a grant or denial of summary judgment is plenary and, like the district court, we must view the facts in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986); see also Hynson, 827 F.2d at 933.
 
 
 2
 In Mitchell, the Supreme Court stated that "a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." 472 U.S. at 526, 105 S.Ct. at 2815. Defendants agree that in this case we need look only at the pleadings. Appellants' Brief at 5. We turn, therefore, to the allegations of the complaint.
 
 
 3
 Kathleen Stoneking, during the relevant period a student at the Bradford Area High School, brought this action against the Bradford Area School District, Frederick Smith, the principal of the Bradford Area High School, Richard Miller, the assistant principal, and Frederick Shuey, the superintendent of the Bradford Area School District.
 
 
 4
 She alleges that the School District hired Edward Wright to serve as its band director in 1976; that during Wright's tenure as band director the band won numerous competitions and Wright enjoyed strong support and backing of the School District and its officials; that a female member of the band informed Principal Smith in 1979 that Wright had attempted to rape and/or sexually assault her but that Smith failed to conduct an investigation or report the allegations to appropriate authorities and instead required the student to issue a public apology to Wright and retract her allegations; that Smith instructed Wright to have no further "one on one" contact with female band members; that plaintiff Stoneking participated in the band during her sophomore, junior and senior years until her graduation in 1983; and that beginning in October 1980 and continuing thereafter until May of 1985, Wright, through physical force, threats of reprisal, intimidation and coercion, sexually abused Stoneking, harassed her, and forced her to engage in various sexual acts with him at various places, including the high school's band room and its environs, Wright's vehicle and house, and on trips for band functions. The complaint also alleges that in March 1986 Wright resigned after a psychologist reported a complaint concerning Wright's sexual abuse of another female band member, and that he was thereafter prosecuted criminally for various sex-related crimes.
 
 
 5
 Stoneking pleads that there was a special custodial relationship between herself and the defendants, that Smith and Miller had actual notice of the allegations of Wright's sexual misconduct and that Shuey either knew or recklessly failed to discover that Wright was sexually abusing female band members. She alleges that the defendants were intentionally, recklessly and deliberately indifferent to the health, safety and welfare of the female student body in general and the plaintiff in particular in that they failed to report the various incidents of suspected sexual abuse of female band members by Wright; failed to adopt an effective policy or policies to prevent the sexual abuse of female students and to promptly report complaints of such abuse to appropriate authorities; failed to properly and vigorously investigate reports of sexual abuse by Wright of female band members; concealed from parents of female band members and public officials the various complaints and accusations that had been made against Wright since 1979; continued to permit Wright to function as band director despite actual notice that he presented a significant threat; and encouraged and perpetuated the custom and course of conduct at the high school whereby allegations of sexual abuse or mistreatment by Wright and other teachers were not investigated and reported. Stoneking alleges that as a result she suffered severe psychological trauma, including severe depression, loss of self-esteem, mental anguish, embarrassment and humiliation, and she seeks compensatory and punitive damages.
 
 
 6
 In their answer,[1] defendants deny most of the allegations directed to liability but admit that in 1979 Smith questioned a female band member regarding a possible relationship with Wright, allege that the student denied the relationship and said she had fabricated the story, admit that in 1984 Smith directed Wright not to place himself in a one-on-one situation with female students, admit that Superintendent Shuey was advised of the actions taken by Smith with respect to Wright, and admit that Smith had a chronological miscellaneous file with notations concerning matters raised about Wright.
 
 
 7
 Following some discovery, defendants moved for summary judgment on the ground, inter alia, of qualified immunity.[2] They contended that "no clearly settled law existed, either at the time of the incidents complained of in the plaintiff's Complaint or as of the present time, which would cause a reasonable person to know either of the constitutional right which allegedly has been violated or that the alleged acts or failure to act on the part of the individual defendants would lead to a violation of that constitutional right." Defendants' Motion for Summary Judgment, Rovito v. Bradford Area School Dist., No. 86-133 (W.D.Pa.) (filed April 10, 1987).[3]
 
 
 8
 The court denied summary judgment on the qualified immunity ground. Stoneking v. Bradford Area School Dist., 667 F.Supp. 1088, 1102 (W.D.Pa.1987). In its opinion, the court referred to evidence submitted in the cases with which this action was consolidated, see supra note 3,[4] including the affidavit of Dr. Chet C. Kent, Superintendent of Keystone Oaks School District, which stated that the policies adopted by the defendants for dealing with suspected cases of sexual assault or sexual harassment deviated significantly from the norm. 677 F.Supp. at 1097-98. The court held that plaintiff had alleged violation of a clearly established constitutional right and that there was evidence by which a jury could conclude that defendants were reckless in their handling of the 1979 incident which involved Judy Grove,[5] in their failure to investigate other reported incidents involving Wright and female students,[6] and in their attempts to remedy and/or rectify the problems involving Wright.[7] The court held that in light of the above, the issue of liability is one for the jury to decide.
 
 
 9
 Although, as we noted above, ordinarily qualified immunity can be determined on the basis of the pleadings, the Supreme Court has recognized, as do our cases, that there may be instances in which discovery may be necessary before a motion for summary judgment on qualified immunity grounds can be resolved. See Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987); see also Brown v. United States, 851 F.2d 615, 617 (1988) (record insufficiently developed on qualified immunity issue); Kovats v. Rutgers, 822 F.2d 1303, 1313 (3d Cir.1987) (legal issues on the qualified immunity question "inextricably intertwined" with the factual issue requiring discovery before determination of qualified immunity issue).
 
 
 10
 In this case, however, defendants are content to stand on the pleadings. The basis for their claim of immunity was that Stoneking did not have a clearly established right to be free from the sexual abuse of Wright, a member of the school's staff, that they were under no clearly established duty to protect her, and that, in any event, they could not reasonably have known that their conduct might violate any of Stoneking's constitutional rights. Because this argument is premised on the assumption that the facts alleged by Stoneking in her complaint are true, we can evaluate the district court's denial of summary judgment on the qualified immunity issue without consideration of the facts adduced on summary judgment, and refer to those facts only to the extent that they amplify the allegations of the complaint.
 
 II.
 Qualified Immunity
 
 11
 The doctrine of qualified immunity entitles government officials performing discretionary functions to immunity from liability for civil damages when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The question before us is whether reasonable school officials in the position of defendants and with the information then available to them should have known that their alleged actions or omissions were unlawful. See Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987) (qualified immunity issue is whether "a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed").
 
 
 12
 In this case, where all parties agree that the existence of qualified immunity may be determined from the pleadings, we need not be concerned with any issue relating to the burden of proof, but rather only with an objective, legal determination of whether the rights alleged were clearly established. See Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738-39. See generally S. Nahmod, Civil Rights and Civil Liberties Litigation Sec. 8.16, at 511 (2d ed. 1986) ("As to the question of the existence of clearly settled law, to speak of a burden of proof with its evidentiary emphasis appears misplaced.... [W]hether clearly settled law existed at the time a defendant acted is an issue of law for the court.").
 
 
 13
 The Supreme Court has recently offered guidance as to what is meant by a "clearly established right," explaining that,
 
 
 14
 [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.
 
 
 15
 Anderson, 107 S.Ct. at 3039 (citations omitted). Anderson thus supports our precedent interpreting the "clearly established" standard as "requiring some but not precise factual correspondence [between the relevant precedents and the conduct at issue] and demanding that officials apply general, well developed legal principles." People of Three Mile Island v. Nuclear Regulatory Commissioners, 747 F.2d 139, 144 (3d Cir.1984); accord Kovats v. Rutgers, 822 F.2d 1303, 1313 (3d Cir.1987).
 
 
 16
 The right that Stoneking alleges defendants violated is her "liberty interest to be free in her person from threats, intimidation and sexual abuse as that perpetrated by Wright." App. at 13. Substantial authority supports the district court's holding that a student has a liberty interest in being free from physical abuse in school. As the court stated in Hall v. Tawney, 621 F.2d 607, 613 (4th Cir.1980), a case involving corporal punishment of a student at school,
 
 
 17
 [t]he existence of this right to ultimate bodily security--the most fundamental aspect of personal privacy--is unmistakably established in our constitutional decisions as an attribute of the ordered liberty that is the concern of substantive due process. Numerous cases in a variety of contexts recognize it as a last line of defense against those literally outrageous abuses of official power whose very variety makes formulation of a more precise standard impossible.
 
 
 18
 This right was established no later than 1977, when the Supreme Court in Ingraham v. Wright held that "corporal punishment in public schools implicates a constitutionally protected liberty interest." 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977); see also Garcia v. Miera, 817 F.2d 650, 656-58 (10th Cir.1987) (law clearly established by 1982 that excessive corporal punishment could violate student's substantive due process rights), cert. denied, --- U.S. ----, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); cf. Youngberg v. Romeo, 457 U.S. 307, 315-16, 102 S.Ct. 2452, 2457-58, 73 L.Ed.2d 28 (1982) (constitutionally protected liberty interest of persons confined in mental institution to safe environment); Milonas v. Williams, 691 F.2d 931, 942-43 (10th Cir.1982) (due process rights of children in quasi-juvenile detention facility violated by certain physically abusive disciplinary practices), cert. denied, 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983); Spence v. Staras, 507 F.2d 554, 557 (7th Cir.1974) (constitutional right of persons confined in mental hospital to be free from physical assault by other patients).
 
 
 19
 Defendants' attempt to distinguish these cases on the grounds that they involved physical, rather than sexual abuse, is unpersuasive. The right at issue is that of personal bodily integrity.[8] We agree with the district court that "common sense suggests that the right to be free from sexual abuse is at least as fundamental as the right to be free from the less intrusive physical abuse of paddling." Stoneking, 667 F.Supp. at 1094. We therefore hold that Stoneking had a constitutionally protected right to be free from sexual abuse by her school teachers that was clearly established by 1979, when defendants were put on notice of Wright's alleged abuse of a female student.
 
 
 20
 In fact, defendants at oral argument conceded that the sexual abuse of Stoneking by Wright was a "constitutional tort," derogating by this concession from their argument that Stoneking had no liberty interest protected by the substantive component of the due process clause. Instead, their argument is that they, in their capacity as school administrators, did not have at the relevant time, and indeed do not now have, a "clearly established" affirmative duty to take steps to protect school children from sexual abuse by a third party, including a staff member. They seek to distinguish the Supreme Court cases delineating state officials' obligation to take affirmative steps to protect a victim of violence on the ground that they arose in a custodial situation, and argue that school administrators do not have the type of special relationship with school children recognized by the law that imposed on them a duty to act in such situations.[9]
 
 
 21
 Defendants' argument that they had no legal duty to Stoneking is based on cases such as Martinez v. California, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), where the Court affirmed the dismissal on proximate cause grounds of a suit against state officials who had paroled a dangerous felon seeking damages for the felon's torture and murder of a fifteen-year old girl five months after his release. The Court explained that, "[t]he parole board was not aware that [plaintiffs'] decedent, as distinguished from the public at large, faced any special danger." Id. at 285, 100 S.Ct. at 559. Following Martinez, this court also held that county officials could not be held liable for the murders of residents in a nearby community committed by an escaped county prisoner. Commonwealth Bank & Trust Co. v. Russell, 825 F.2d 12 (3d Cir.1987).
 
 
 22
 These cases do not hold, however, that state officials can never be liable for harm committed by a third party. In fact, the Court in Martinez cautioned that "[w]e need not and do not decide that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole." 444 U.S. at 285, 100 S.Ct. at 559 (footnote omitted). In Russell, we stated that "[i]t is clear ... that Sec. 1983 is not limited to cases of direct harm inflicted by state officials. This is suggested by the distinction made in Martinez between that victim there and those who the authorities knew face a 'special danger.' " 825 F.2d at 16.
 
 
 23
 It is incontestable that custodians have some duty to protect those in their custody from physical abuse by third persons. See Youngberg, 457 U.S. at 324, 102 S.Ct. at 2462 ("state ... has the unquestioned duty to provide reasonable safety for all residents ... within the institution [for the mentally retarded]"); see also Spence, 507 F.2d at 557; cf. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (Eighth Amendment right of prisoner to be provided with adequate medical treatment). Cases after Martinez have held that such a duty is not limited to the custodial relationship. Thus, in Estate of Bailey by Oare v. County of York, 768 F.2d 503 (3d Cir.1985), we held that if a state social services agency is aware that a particular child has been abused, a special relationship arises that creates an affirmative duty on the part of the state agency to protect that child from further abuse. See Wood v. Ostrander, 851 F.2d 1212, 1218 (9th Cir. 1988) (law clearly established that police officer has duty under section 1983 not to abandon passengers of arrested drivers thereby exposing them to unreasonable danger); Taylor v. Ledbetter, 818 F.2d 791 (11th Cir.1987) (in banc) (holding that "a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action [against the foster care agency] for violation of fourteenth amendment rights [for failure to protect foster children from abuse]"); Doe v. New York City Department of Social Services, 649 F.2d 134, 145-46 (2d Cir.1981) (state foster care agency has an affirmative duty to protect a child from physical and/or sexual abuse inflicted by the child's foster parents); White v. Rochford, 592 F.2d 381, 383-86 & n. 6 (7th Cir.1979) (allegations that police officers, after arresting an adult driver, left the children passengers alone in the car on a busy highway in cold weather stated a claim under the Fourteenth Amendment); Doe "A" v. Special School Dist., 637 F.Supp. 1138, 1143-45 (E.D.Mo.1986) (substantive due process right of school children not to be sexually abused by school bus driver); see also Jensen v. Conrad, 747 F.2d 185, 194 (4th Cir.1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). Contra Harpole v. Arkansas Dep't of Human Services, 820 F.2d 923 (8th Cir.1987); DeShaney v. Winnebago County Department of Social Services, 812 F.2d 298 (7th Cir.1987), cert. granted, --- U.S. ----, 108 S.Ct. 1218, 99 L.Ed.2d 419 (1988).
 
 
 24
 Stoneking's relationship vis-a-vis her school's principal, assistant principal, and even school district superintendent, is patently not comparable to that of an unidentified "member of the general public, living in the free society, and having no special custodial or other relationship" with state parole officers who released a parolee. See Fox v. Custis, 712 F.2d 84, 88 (4th Cir.1983). Although she was not in a technical sense in defendants' legal "custody," as was the child in Bailey and Taylor, she was a member of a known and identifiable class of potential victims--female students in general, and female band members in particular.
 
 
 25
 Under Pennsylvania law Stoneking was required to attend school. See 24 Pa.Stat.Ann. Sec. 13-1327 (Purdon Supp.1988); see also 24 Pa.Stat.Ann. Sec. 13-1333 (Purdon Supp.1988) (imposing penalty of fine and/or jail on parents and guardians who violate compulsory education statute). Because students are placed in school at the command of the state and are not free to decline to attend, students are in what may be viewed as functional custody of the school authorities, at least at the time they are present.
 
 
 26
 It is abundantly clear that "the state has expressly stated its desire to provide affirmative protection" to students. See Bailey, 768 F.2d at 509; see also Jensen, 747 F.2d at 194-95 n. 11. The Pennsylvania Child Protective Services law, 11 Pa.Stat.Ann. Sec. 2202 et seq., provides that "schooladministrator[s]" are mandated to report suspected child abuse, 11 Pa.Stat.Ann. Sec. 2204(c) (Purdon Supp.1988). Even if they were under no statutory duty to report suspected instances of sexual assault perpetrated by teachers, as opposed to that inflicted by parents and other "person[s] responsible for the child's welfare," see Pennsylvania State Educ. Assoc. v. Department of Public Welfare, 68 Pa.Commw. 279, 449 A.2d 89 (1982), the Act reflects the state's broad policy "to encourage more complete reporting of suspected child abuse and ... [to] provid[e] protection for children from further abuse," 11 Pa.Stat.Ann. Sec. 2202 (Purdon Supp.1988). See generally, Beaty & Woolley, Child Molesters Need Not Apply: A History of Pennsylvania's Child Protective Services Law and Legislative Efforts to Prevent the Hiring of Abusers by Child Care Agencies, 89 Dick.L.Rev. 669 (1985).
 
 
 27
 Moreover, Pennsylvania law has since 1911 explicitly vested school officials with authority in loco parentis over students. See 24 Pa.Stat.Ann. Sec. 13-1317 (Purdon Supp.1988);[10] cf. New Jersey v. T.L.O., 469 U.S. 325, 336, 105 S.Ct. 733, 739-40, 83 L.Ed.2d 720 (1985) ("[t]oday's public school officials do not merely exercise authority voluntarily conferred on them by individual parents; rather, they act in furtherance of publicly mandated educational and disciplinary policies"). The importance that Pennsylvania attaches to the educational process is apparent from its very Constitution, which provides "for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Pa. Const. art. 3, Sec. 14. Indeed, the statute permitting termination of a teacher's contract for, inter alia, "immorality", see 24 Pa.Stat.Ann. Sec. 11-1122 (Purdon 1962), was construed to cover termination of a teacher who had proposed spanking two female high school students in a manner which the students perceived as sexual in nature. See Penn-Delco School Dist. v. Urso, 33 Pa.Commw. 501, 382 A.2d 162 (1978).
 
 
 28
 Even if there were no other Pennsylvania statutes explicitly directed to the obligation of school administrators to protect school children,[11] the duty owed by a school official to protect students from the tortious or criminal conduct of teachers has long been established in the common law.[12] See W. Keeton, Prosser and Keeton on the Law of Torts, Sec. 56, at 383 (5th ed. 1984); see, e.g., Wagenblast v. Odessa School District, 110 Wash.2d 845, 758 P.2d 968 (1988) (public school may not condition participation in interscholastic athletics on students releasing school district from all potential negligence claims because, inter alia, "school district owes a duty to its students to employ ordinary care and to anticipate reasonably foreseeable dangers so as to take precautions for protecting the children in its custody from such dangers"); Doe v. Durtschi, 110 Idaho 466, 716 P.2d 1238, 1243-44 (1986) (school district may be held liable for its negligence arising out of teacher's sexual assault of students); Galli v. Kirkeby, 398 Mich. 527, 248 N.W.2d 149, 152 (1976) (school board may be liable, under theory of respondeat superior, for principal's homosexual assaults on a student); Schultz v. Gould Academy, 332 A.2d 368, 370-71 (Me.1975) (boarding school liable when intruder gains access to dormitory room and criminally assaults female student).
 
 
 29
 As embodied in the Restatement (Second) of Torts Sec. 320 (1965), expressly made applicable to school officials in comment a,
 
 
 30
 [o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor
 
 
 31
 (a) knows or has reason to know that he has the ability to control the conduct of the third persons, and
 
 
 32
 (b) knows or should know of the necessity and opportunity for exercising such control.
 
 
 33
 See also id. Sec. 315 (duty may arise where "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third party's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection").
 
 
 34
 While Pennsylvania school officials, like its other government officials, enjoy a broad statutory immunity,[13] the fact that defendants may be immune under state law does not detract from the existence of a common law duty, nor does it alter their potential liability under section 1983. See Wade v. City of Pittsburgh, 765 F.2d 405, 407-08 (3d Cir.1985).
 
 
 35
 There is thus an adequate basis from the Pennsylvania child abuse reporting and in loco parentis statutes, coupled with the broad common law duty owed by school officials to students, to conclude there was a desire on the part of the state to provide affirmative protection to students.
 
 
 36
 It follows that if, as we must assume from the complaint, the defendants knew, or should have known, at least as early as 1979 from the Grove incident, of Wright's sexual misconduct with a female band student, they were on notice that female band members faced a "special danger." See Martinez, 444 U.S. at 285, 100 S.Ct. at 559. In these circumstances, defendant school officials had a constitutional duty to investigate and take reasonable steps to protect the students. Defendants stated at oral argument that they had a duty to investigate the complaints but not a duty to protect the students. The distinction is meaningless, because the duty to investigate must also encompass some duty to act based on the results of the investigation.
 
 
 37
 Even if we were to accept defendants' argument, which is unsupported by any court decision, that state officials have the affirmative duty to protect individuals "only in situations where individuals are helpless to protect themselves from harm and government officials in a position to prevent this harm are made aware of or have actually caused the individuals to be in a position where they are helpless to protect themselves," Appellant's Brief at 19, the allegations of the complaint satisfy this standard. Surely impressionable teenagers faced with sexual harassment by a school authority figure cannot be deemed the emotional equivalents of independent adults.
 
 
 38
 Defendants state that "the right asserted by [Stoneking] was not established in 1979 by clearly established law," Appellant's Brief at 11, but limit their argument on this issue to their contention that their response to the 1979 allegations was objectively appropriate. Even though they never expressly argue that many of the section 1983 cases which have expounded upon the special relationship which gives rise to a duty to protect from harm by third parties had not been decided in 1979, when defendants were put on notice of Wright's activities, compare Jensen, 747 F.2d at 194-95 (constitutional right of affirmative protection not clearly established until after 1980), we consider that argument and reject it.
 
 
 39
 We do so relying not only on section 1983 cases,[14] but also on the entrenched common law duty owed by a school official to protect students from attacks by teachers. Furthermore, after Ingraham v. Wright was decided in 1977, every reasonable school official should have known that it was a breach of this duty knowingly to stand by and take no action to protect a student from a beating administered by a faculty member. Since, as we noted above, sexual abuse is at least as traumatic as physical abuse, it is implausible that by 1979 reasonable school officials would not have known that there was a duty to take some affirmative action to investigate and protect students from a teacher's sexual abuse of which they were made aware, and to take steps to eliminate rather than condone an atmosphere in which teachers could sexually harass students with impunity.
 
 
 40
 Finally, defendants argue that we cannot sustain the district court's order denying their defense of qualified immunity unless we find their direction to Wright in 1979 to avoid one-on-one contact with female students was objectively inadequate. We cannot reach this issue at this stage of the litigation because it goes to the merits of the plaintiff's section 1983 claim. It is thus akin to the "I didn't do it" defense which is not cognizable at this stage. See Chinchello, 805 F.2d at 131.
 
 
 41
 The ruling in Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), that denial of qualified immunity claims will be immediately appealable has imposed on the courts of appeals the responsibility of drawing the elusive line between the existence of a "clearly established" right and the question whether the conduct at issue violated that right. In this case, there is an expert affidavit countering defendants' bald contention that their response to the allegations of misconduct fell within the parameters of their reasonable professional judgment.[15] This creates a fact issue which must be determined by the factfinder. We express no view either as to whether defendants' conduct rose to the level actionable under section 1983, see Colburn v. Upper Darby Twp., 838 F.2d 663, 667-70 (3d Cir.1988), or as to the reasonableness of defendants' conduct in this case.
 
 III.
 Conclusion
 
 42
 For the reasons expressed herein, we will affirm the order of the district court denying defendants summary judgment on qualified immunity grounds and remand for further proceedings consistent with this opinion.
 
 
 43
 STAPLETON, Circuit Judge, dissenting.
 
 
 44
 A school teacher, school administrator, or anyone else acting under color of state law clearly violates the Constitution if he or she sexually abuses a student. That principle is not helpful here, however, because this suit does not involve a claim against Wright. Accordingly, the court's opinion attempts to establish that school officials owe a "constitutional duty to investigate" any complaint regarding conduct, presumably by anyone, that might possibly pose a threat to the "personal bodily integrity" of school children within their jurisdiction and a resulting constitutional duty to protect from harm any child whom that investigation might have disclosed to be at risk. While I have substantial reservations about the soundness of this legal conclusion, this appeal provides no occasion to embrace or reject it. The appellants are entitled to immunity unless it should have been readily apparent to them based on the previously decided cases that their failure to do more about the 1979 complaint concerning Wright would violate the constitutional rights of one in Stoneking's position. The court has found no case from which its "constitutional duty to investigate" is "readily apparent" and that should be the end of the matter. Even assuming that the court's analysis is ultimately determined to have merit, the Supreme Court has made it crystal clear that public officials must not be required to predict the advance of constitutional law at their peril.
 
 
 45
 We have held that a state official has an affirmative duty to protect another from third parties if, but only if, a "special relationship" exists between the two. We have found such a relationship between employees of a state social services agency and a child placed by the agency whom the employees know to be in jeopardy. Estate of Bailey by Oare v. County of York, 768 F.2d 503 (3d Cir.1985). While the Supreme Court has not yet put its imprimatur on the "special relationship" doctrine, a number of other Courts of Appeals have embraced it and, for present purposes, we may accept it, arguendo, as clearly established law. See, e.g., Jensen v. Conrad, 747 F.2d 185, 193-95 (4th Cir.1984) (reviewing prior caselaw on "special relationship" doctrine and stating guidelines for "special relationship" analysis, but holding defendant state and county social services agency officials entitled to immunity from suit alleging failure to protect abused children because the law as it affected them was not clearly established at the time of the alleged wrongdoing), cert. denied 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985); Taylor v. Ledbetter, 818 F.2d 791, 797-98 (11th Cir.1987) (in banc) (analogizing to prison context, finding that a special relationship exists between state foster care agency officials and foster children); cf. DeShaney v. Winnebago County Dep't of Social Services, 812 F.2d 298, 303 (7th Cir.1987) (recognizing special relationship in prison context, but finding "no basis in the language of the due process clauses or the principles of constitutional law for a general doctrine of 'special relationship' "), cert. granted --- U.S. ----, 108 S.Ct. 1218, 99 L.Ed.2d 419 (1988); Harpole v. Arkansas Dep't of Human Services, 820 F.2d 923, 926 (8th Cir.1987) (agreeing with Seventh Circuit that special relationship concept is applicable only in prison or prison-like environments). Neither this court nor any other federal court of appeals has held, however, that a special relationship exists between a school administrator and students within his or her jurisdiction.
 
 
 46
 The court's argument for finding a special relationship is quite properly based on analogy. The analogies employed, however, are not sufficiently close to the situation before us to make the court's conclusion "readily apparent" to reasonable school administrators. While school attendance is mandatory, for example, the relationship between a superintendent of a public school district and high school students within the district is clearly distinguishable from that between a social worker and her five-year old ward or that between a jailer and his incarcerated charge. Indeed, the differences between the warden-prisoner relationship and the relationship of school officials to schoolchildren were recognized by the Supreme Court in Ingraham v. Wright:
 
 
 47
 The prisoner and the schoolchild stand in wholly different circumstances, ...
 
 
 48
 The schoolchild has little need for the protection of the Eighth Amendment. Though attendance may not always be voluntary, the public school remains an open institution. Except perhaps when very young, the child is not physically restrained from leaving school during the school hours; and at the end of the school day, the child is invariably free to return home. Even while at school, the child brings with him the support of family and friends and is rarely apart from teachers and other pupils who may witness and protest any instances of mistreatment.
 
 
 49
 The openness of the public school and its supervision by the community afford significant safeguards against the kinds of abuses from which the Eighth Amendment protects the prisoner.
 
 
 50
 430 U.S. 651, 670, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1976). The same characteristics distinguish the situation of the schoolchild from that of the foster child. As the Eleventh Circuit said in Taylor v. Ledbetter, in the course of finding an analogy between the situation of a foster child and that of a prisoner,
 
 
 51
 Ingraham v. Wright ... is not a bar to this holding.... In Ingraham, the Court discussed the cost of providing additional benefits and safeguards to school children threatened with punishment. It found the cost of benefits and additional safeguards high and the risk of harm to school children low. In the foster home setting, recent events lead us to believe that the risk of harm to children is high.... Children in foster homes, unlike children in public schools, are isolated; no persons outside the home setting are present to witness and report mistreatment. The children are helpless. Without the investigation, supervision, and constant contact required by statute, a child placed in a foster home is at the mercy of the foster parents.
 
 
 52
 818 F.2d at 797.
 
 
 53
 Because of these distinctions, I would be reluctant to deny immunity to these defendants even if the plaintiff were Ms. Grove and Wright's assault on her had followed her complaint about him. We need not decide that issue, however. It is one thing to hold that a public school administrator has a duty to protect a particular student within his or her jurisdiction whom he or she knows to be in particular jeopardy. It is another to hold that there is an affirmative duty to protect an individual in a position like that of Stoneking, whom the administrator had no reason to believe was any more at risk from sexually aggressive teachers than her female classmates.[1] The court points to nothing that should have made the leap between these two propositions apparent to these school administrators. Indeed, authorities relied upon by the court suggest that there is no duty to protect in the absence of notice that a particular individual is in peril. In Jensen v. Conrad, for example, the court described its prior caselaw on special relationships as having held such relationships existed "with respect to inmates in the state's prisons or patients in its mental institutions whom the state knows to be under specific risk of harm from themselves or others in the state's custody or subject to its effective control." 747 F.2d at 193 (emphasis supplied). And in Estate of Bailey, we held that a special relationship and concomitant affirmative constitutional duty arises where a state social services agency is aware that a particular child has been abused. See also Wood v. Ostrander, 851 F.2d 1212, 1216-19 (9th Cir.1988) (holding that a police officer was not entitled to qualified immunity where he had arrested Wood's male companion, taken the car keys, and left Wood stranded in a high-crime area five miles from her home at 2:30 a.m., and reasonably should have been aware of the danger to Wood); White v. Rochford, 592 F.2d 381, 383-86 (7th Cir.1979) (holding that police officers were not entitled to qualified immunity where they had arrested the uncle of three minor children, leaving the children stranded in the car on a busy eight-lane expressway, and could not have avoided knowing of the danger to the children).
 
 
 54
 Because the court here holds the defendant officials personally liable in damages for the commission of a constitutional tort that is established as such only by the opinion in this case, I respectfully dissent.
 
 
 
 [1]
 Defendants filed their answer after the court denied their motion to dismiss raising, inter alia, qualified immunity as a defense
 
 
 [2]
 The defendants also asserted that Stoneking's federal claim was barred by the applicable statute of limitations, that Stoneking had not established a violation of her constitutional rights, and that she had failed to state a cause of action under either section 1983 or state law. The district court denied the motion as it pertained to the federal claim, but granted it as to the state law claim, stating that "the pleadings are not sufficient to give notice of the claim alleged." Stoneking v. Bradford Area School Dist., 667 F.Supp. 1088, 1103 (W.D.Pa.1987). The district court later certified its order as it related to the statute of limitations issue for interlocutory appeal and continued the trial of the case pending appeal. By an order dated October 13, 1987, this court denied defendants' petition for permission to appeal the district court's ruling on the statute of limitations issue. Stoneking v. Bradford Area School Dist., No. 87-8061 (3d Cir. Oct. 13, 1987)
 
 
 [3]
 Defendants' motions incorporated by reference their comparable motions filed in similar actions filed by two other Bradford Area High School students, Kim Harbaugh and Lisa Rovito, who allege that they were sexually abused by Wright and assert liability on the same basis as does Stoneking. Prior to ruling on the summary judgment motion, the district court consolidated Stoneking's actions for trial with those of Harbaugh and Rovito. See 667 F.Supp. at 1089 n. 1
 
 
 [4]
 In response to an order entered by this court on June 20, 1988, the district court entered an order on July 7, 1988 supplementing the Stoneking record with the materials submitted in the Harbaugh and Rovito cases
 
 
 [5]
 There is evidence that in the fall of 1979, Judy Grove, a female band member, complained to Smith and Miller that Wright had sexually assaulted her, that Grove's complaint was confirmed to Smith and Miller both by Grove's father and by an independent student counselor and that Smith and Miller responded by presenting Grove with the choice of either withdrawing from the band or publicly recanting her story. Grove testified that in 1979, Smith instituted a policy whereby Wright was forbidden from having one-on-one contact with any female student. Defendants' answer admits that Shuey had knowledge of the 1979 Grove incident. Dr. Chet C. Kent opines that the handling of the Grove incident was "so far below the minimum accepted and generally prevailing administrative standard that [it] constituted deliberate or recklessly indifferent conduct...." Affidavit of Chet C. Kent, submitted by Kim Harbaugh in response to Defendants' Motion for Summary Judgment (hereinafter Kent Affidavit) at 17
 
 
 [6]
 There is evidence that, for example, in 1984, the year following Stoneking's graduation from the Bradford Area High School, another female band member complained to Smith that she was being sexually abused by Wright. In response, Smith reiterated the no one-on-one policy between Wright and female students that he had instituted in connection with the Grove incident, and told Wright not to discuss the incident with anyone. Smith also informed Shuey of the student's complaint and of the actions that he had taken in response. Kent concludes that in view of the fact that neither Smith nor Shuey investigated the complaint, informed the student's parents, called the child abuse hot line, or disciplined Wright in any way, "their behavior demonstrates deliberate or reckless indifference and callous disregard for [the student's] safety." Kent Affidavit at 18
 The factual nature of the evidence before the court, see also supra note 5 and infra note 7, thus distinguishes this case from that of Scott v. Willis, 543 A.2d 165 (Pa.Commw.Ct.1988), on which defendants rely, where the court stated that "in the case at bar, Appellants have not pled any facts to suggest that any of the Appellees had notice of [the teacher's] dangerous proclivities." Id. at 171 (emphasis in original).
 
 
 [7]
 The records in the companion cases are replete with evidence of instances of students' complaints to one or more of the defendants of sexual misconduct by various teachers at the Bradford Area High School. These included a female student's complaint in 1978 that a teacher had made sexual advances to her while she was alone with him in his classroom correcting papers, to which Smith responded by telling her that it would be her word against the teacher's and warning her not to tell her parents; a female student's complaint in January 1981 that the same teacher had kissed her on the neck; another student's complaint in March 1981 that the same teacher had blindfolded her in a sensitivity test and then gotten down on his hands and knees and looked up her dress; another student's complaint in November 1982 that the teacher had asked her to sit on his lap during a party; and a 1985 complaint from the father of a female student that the teacher had placed his hands on his daughter's body. Other incidents included that of a different teacher's having written a suggestive note to a student, and another teacher having had an affair with a student. There is no evidence that defendants investigated or reported any of these complaints, leading Dr. Kent to conclude that, at least as to defendants Smith and Shuey, their behavior "encouraged a climate to flourish where innocent girls were victimized," Kent Affidavit at 20, and that, had Smith and Shuey taken appropriate steps, "Wright would have been prevented from preying on other female band members and a safe school environment would have been created for all girls." Kent Affidavit at 22
 
 
 [8]
 In her deposition Stoneking testified that Wright fondled and kissed her breasts, inserted his fingers into her vagina, exposed himself to her and forced her to handle his genitals, and occasionally compelled her to have oral sex with him. Stoneking Deposition II at 341-44, 351-52
 
 
 [9]
 This aspect of defendants' qualified immunity argument is properly before us on this appeal. As we held in Chinchello v. Fenton, 805 F.2d 126, 131 (3d Cir.1986), the "absence of a clearly established legal duty ... can accurately be described as a contention that [defendant] violated no clearly established legal norm" and "treating [that contention] in this manner will best serve the objectives of Mitchell." Of course, this contention must be distinguished from the "I didn't do it" defense, of which we cannot take cognizance at this stage. Id
 
 
 [10]
 24 Pa.Stat.Ann. Sec. 13-1317 provides:
 Every teacher, vice principal and principal in the public schools shall have the right to exercise the same authority as to conduct and behavior over the pupils attending his school, during the time they are in attendance, including the time required in going to and from their homes, as the parents, guardians or persons in parental relation to such pupils may exercise over them.
 
 
 [11]
 A Pennsylvania statute effective January 1, 1986 provides that prospective school employees who have direct contact with children may not be hired if they have been convicted of, inter alia, statutory rape, indecent assault, sexual abuse of children, and corruption of minors within the preceding five years. 24 Pa.Stat.Ann. Sec. 1-111 (Purdon Supp.1988)
 
 
 [12]
 Although a state law duty is not equivalent to a constitutional duty, see Archie v. City of Racine, 847 F.2d 1211, 1216-19 (7th Cir.1988), that body of law may be instructive as to the duty owed. See, e.g., Doe v. New York City Dep't of Social Services, 649 F.2d at 145-46
 
 
 [13]
 See 42 Pa.Cons.Stat.Ann. Secs. 8541, 8542 (Purdon 1982). See generally Note, Judicial Clarification of a Common Law Doctrine: the Pennsylvania Doctrine of Official Immunity, 84 Dick.L.Rev. 473 (1980). Pennsylvania courts interpret the immunity statute broadly, and the exceptions thereto narrowly. See City of Philadelphia v. Love, 98 Pa.Commw. 138, 509 A.2d 1388 (1986), appeal granted, 514 Pa. 644, 523 A.2d 1132 (1987); see also Scott v. Willis, 543 A.2d 165 (Pa.Commw.Ct.1988) (affirming dismissal of plaintiff's complaint against school officials arising out of their failure to protect young school children from teacher's sexual assault on grounds that plaintiff failed to plead sufficient factual or legal predicate to establish willful misconduct exception to governmental immunity, 42 Pa.Cons.Stat.Ann. Sec. 8550 (Purdon 1982))
 
 
 [14]
 There was substantial authority by 1979 that state officials have a duty to protect institutionalized persons from self-injury or assault by fellow inmates and staff, see, e.g., Goodman v. Parwatikar, 570 F.2d 801, 804 (8th Cir.1978); Spence v. Staras, 507 F.2d 554, 557 (7th Cir.1974), and holding that a prisoner has a constitutional right to a safe environment and that the prison officials have a corresponding duty to reasonably insure that safe environment to prisoners, see, e.g., Estelle v. Gamble, 429 U.S. 97, 103-04, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976) (obligation to provide medical treatment); Stokes v. Delcambre, 710 F.2d 1120 (5th Cir.1983) (pretrial detainee's right to be protected from another inmate's physical and sexual abuse clear as of at least 1979); see also Davis v. Zahradnick, 600 F.2d 458 (4th Cir.1979) (prisoner's right to be protected from beating by guard). Further, Stoneking did not graduate until 1983, by which time the legal principles were even more clearly established. See Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); cf. Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982) (even in non-custodial situations, "if the state puts the man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much as active tortfeasor as if it had thrown him into a snake pit.")
 
 
 [15]
 In Youngberg, 457 U.S. at 323, 102 S.Ct. at --- (footnote omitted), the Court held there would be liability only if defendants' conduct was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [they] actually did not base the decision on such a judgment."
 
 
 [1]
 To say, as does the court, that Stoneking "was a member of a known and identifiable class of potential victims--female students in general, and female band members in particular" serves neither to cabin the newly-created liability nor to bring this case within the scope of a precedent of which these school administrators should have known