882 F.2d 720
 58 USLW 2135, 55 Ed. Law Rep. 429
 Kathleen STONEKING
v.
BRADFORD AREA SCHOOL DISTRICT, Frederick Smith, in his
individual and official capacity as principal of the
Bradford Area High School; Richard Miller, in his
individual and official capacity as assistant principal of
the Bradford Area High School; and Frederick Shuey, in his
individual and official capacity as Superintendent of the
Bradford Area School District.
Appeal of Frederick SMITH, Richard Miller, and Frederick Shuey.
 No. 87-3637.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 3, 1988.
Decided Sept. 12, 1988.
Certiorari Granted March 6, 1989.
On Remand from the Supreme Court
of the United States March 6, 1989.
Argued on Remand from the Supreme Court
May 18, 1989.
Decided Aug. 16, 1989.
Rehearing and Rehearing In Banc Denied
Sept. 12, 1989.
 
 Kenneth D. Chestek (argued), Murphy, Taylor & Adams, P.C., Erie, Pa., James D. McDonald, Jr., McDonald Law Group, Erie, Pa., for appellants.
 Wallace J. Knox, Sean J. McLaughlin, Richard A. Lanzillo, Knox McLaughlin Gornall & Sennett, P.C., Erie, Pa., Deborah W. Babcox (argued), Pecora Duke & Babcox, Bradford, Pa., for appellee.
 Before SLOVITER, STAPLETON, and MANSMANN, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 This case is before us on remand from the United States Supreme Court which vacated our judgment and remanded for further consideration in light of DeShaney v. Winnebago County Department of Social Services, --- U.S. ----, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). This case was originally heard on the appeal of the individual defendants from the denial by the district court of their motion for summary judgment on the grounds of qualified immunity. We affirmed, rejecting the defendants' contention that they were not alleged to have violated plaintiff's clearly established right. Stoneking v. Bradford Area School Dist., 856 F.2d 594 (3d Cir.1988) (Stoneking I ), vacated sub nom. Smith v. Stoneking, --- U.S. ----, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989). It is now incumbent upon us to reconsider that decision.[1]I.
 
 
 2
 Kathleen Stoneking filed suit under 42 U.S.C. Sec. 1983 against the Bradford Area School District, Frederick Smith, the principal of the Bradford Area High School, Richard Miller, the assistant principal, and Frederick Shuey, the superintendent of the School District. Each of the individual defendants was sued in both his individual and official capacity. Stoneking prayed for relief in the form of compensatory and punitive damages against Shuey, Smith, Miller and the School District.
 
 
 3
 Stoneking's complaint alleged that Edward Wright, a School District employee who was the Band Director at Bradford High, used physical force, threats of reprisal, intimidation and coercion to sexually abuse and harass her and to force her to engage in various sexual acts beginning October 1980, when she was a high school student, and continuing through Stoneking's sophomore, junior and senior years until her graduation in 1983 and thereafter until 1985. Defendants concede that some of these acts occurred in the band room at the high school and on trips for band functions, as well as in Wright's car and in his house while Stoneking babysat or after he gave her a music lesson. Wright was ultimately prosecuted for various sex-related crimes and pled guilty.
 
 
 4
 Stoneking averred that in 1979, before Wright's actions toward her, another female member of the band informed Smith that Wright had attempted to rape or sexually assault her; that Smith, in his capacity as principal, maintained a personal file on Wright which contained reports of complaints of sexual misconduct by female students in the band program; that Smith announced to Wright a "policy" with respect to his contact with female students under which he was to have no further "one on one" contacts with female band members; that Smith, Miller and Shuey "failed to take any action to protect the health, safety and welfare of the female student body" and Stoneking, App. at 10; that Miller and Shuey were also on notice of the complaints of sexual misconduct by Wright and of the policy adopted by Smith under which Wright was to have no one-on-one contact with female band members, or, if Shuey was not aware, it was because of "the defective and deficient policies and customs" of the School District, App. at 11; and that Wright threatened his victims that if they reported his actions they would incur "loss of parental support, the esteem of friends and the dissolution of the school band which had become ... a significant institution to the School District and the community in general," App. at 12.
 
 
 5
 After discovery in this case and in cases filed by other students who alleged they were also sexually abused by Wright, defendants moved for summary judgment in the actions against them in their individual capacities on the basis of qualified immunity. As we explained in our earlier opinion, defendants contended that "no clearly settled law existed, either at the time of the incidents complained of in the plaintiff's Complaint or as of the present time, which would cause a reasonable person to know either of the constitutional right which allegedly has been violated or that the alleged acts or failure to act on the part of the individual defendants would lead to a violation of that constitutional right." 856 F.2d at 596.
 
 
 6
 The district court denied the defendants' motion for summary judgment, holding that there was evidence from which a jury could conclude that defendants were reckless in their handling of an incident of abuse which had been reported to Smith in 1979, in their failure to investigate other reported incidents involving Wright and other female students, and in their attempts to remedy and/or rectify the problems involving Wright. Stoneking v. Bradford Area School Dist., 667 F.Supp. 1088, 1098 (W.D.Pa.1987).
 
 
 7
 On appeal, defendants argued that they were entitled to qualified immunity because they had no clearly established duty to protect Stoneking, and therefore there was no basis upon which a violation of 42 U.S.C. Sec. 1983 could be predicated. We rejected that contention, holding that under the applicable state law a special relationship arose between the school officials and students entrusted to their care, and that the Pennsylvania child abuse reporting and in loco parentis statutes, coupled with the broad common law duty of officials to students, evidenced a desire on the part of the state to provide affirmative protection to students. 856 F.2d at 603. Defendants now argue that the Supreme Court's decision in DeShaney controls our decision and mandates a holding that the school authorities owed no constitutional duty of protection to Stoneking.
 
 
 8
 In DeShaney, the Court held that a minor could not maintain an action against Winnebago County, its Department of Social Services, and various individual employees of the Department for injuries he received at the hands of his father, even though the county caseworker returned DeShaney to the father's custody and allegedly knew or should have known of the risk of violence to him at his father's hands. The Court's analysis was straightforward: it held that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 109 S.Ct. at 1004. It rejected the analysis adopted by, inter alia, this court in Estate of Bailey by Oare v. County of York, 768 F.2d 503, 510-11 (3d Cir.1985), that under similar circumstances a "special relationship" arose between the state and the child which imposed an affirmative constitutional duty to provide adequate protection.
 
 
 9
 The Court held that because there was no constitutional duty on the state to provide its citizens with particular protective services, "the State cannot be held liable under the [Due Process] Clause for injuries that could have been averted had it chosen to provide them." 109 S.Ct. 1004 (footnote omitted). It distinguished DeShaney's situation from those "limited circumstances [in which] the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." 109 S.Ct. at 1004-05. It stated that prior cases stood only for the proposition that, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being," 109 S.Ct. at 1005-06 (citing Youngberg v. Romeo, 457 U.S. 307, 317, 102 S.Ct. 2452, 2459, 73 L.Ed.2d 28 (1982) (state must provide involuntarily committed mental patients with services necessary to insure their reasonable safety), and Estelle v. Gamble, 429 U.S. 97, 103-04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (prison authorities must treat medical needs of an inmate)).
 
 
 10
 In light of the Supreme Court's discussion in DeShaney distinguishing between affirmative duties of care and protection imposed by a state on its agents and constitutional duties to protect, we can no longer rely on the statutory and common law duties imposed in Pennsylvania on school officials as the basis of a duty to protect students from harm occurring as a result of a third person.
 
 
 11
 Arguably, our earlier discussion noting that "students are in what may be viewed as functional custody of the school authorities" during their presence at school because they are required to attend under Pennsylvania law, see 856 F.2d at 601 (citing 24 Pa.Stat.Ann. Sec. 13-1327 (Purdon Supp.1988)), is not inconsistent with the DeShaney opinion. In DeShaney, the Court stated that "[h]ad the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." 109 S.Ct. at 1006 n. 9. The Court then explicitly referred to court of appeals cases holding, by analogy to Estelle and Youngberg, "that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents," but expressed no view on the validity of this analogy. Id. (citing Doe v. New York City Dept. of Social Services, 649 F.2d 134, 141-42 (2d Cir.1981); Taylor ex rel. Walker v. Ledbetter, 818 F.2d 791, 794-97 (11th Cir.1987) (en banc), cert. denied, --- U.S. ----, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989)).
 
 
 12
 The situation of school children, compelled by state law to attend school, who are physically mistreated by School District employees, may not be dissimilar to that of children in foster homes mistreated by their foster parents. However, we prefer not to rest our decision again on an affirmative duty to protect such students in this situation because the uncertainty of the law in this respect may cause further delay. We are advised that the trial of this case against the School District and the defendants in their official capacities has been held up during the pendency of the appeal by defendants on the denial of their motion for summary judgment on the claims against them in their individual capacities. Therefore, we believe it is more expedient to decide whether plaintiff's claim before us would withstand summary judgment even if we could not rely on the special relationship which the Supreme Court's footnote in DeShaney may still leave as a viable basis for liability.
 
 II.
 
 13
 The principal distinction between DeShaney's situation and that of Stoneking is that DeShaney's injuries resulted at the hands of a private actor, whereas Stoneking's resulted from the actions of a state employee. The significance of the status of the perpetrator as a private actor rather than as a state official is referred to on numerous occasions in the DeShaney opinion. Not only is the Court's statement of the holding in terms of the identity of the actor ("a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," 109 S.Ct. at 1004), but the analytic steps taken by the Court to reach that holding continuously take note of the status of the person responsible for the injuries. See, e.g., "nothing in the language of the Due Process Clause itself requires the state to protect the life, liberty and property of its citizens against invasion by private actors;" the Due Process Clause "forbids the State itself to deprive individuals of life, liberty or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to insure that those interests do not come to harm through other means;" the purpose of the Due Process Clause "was to protect the people from the State, not to insure that the State protected them from each other." 109 S.Ct. at 1003 (emphasis added).
 
 
 14
 Unlike DeShaney's father, who was referred to throughout the DeShaney opinion as a private third party, Wright was a school district employee subject to defendants' immediate control. In fact, many of Wright's interactions with Stoneking occurred in the course of his performance of his official responsibilities, such as during school-sponsored events and trips, and sometimes on school property.
 
 
 15
 It is immaterial for this purpose whether Wright's sexual abuse is viewed as attributable to the state. This consideration would be relevant had Stoneking sued Wright under section 1983, alleging that he acted under color of state law. She did not. Instead, the suit is against the School District and its supervisory officials, and they were incontestably acting under color of state law.
 
 
 16
 Defendants argue that Stoneking's emphasis on the fact that Wright was an agent and employee of the school district is merely an assertion of "supervisory liability", or respondeat superior, which cannot be a basis of liability. See Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). However, this is not a case in which Stoneking alleges that defendants are vicariously liable because of Wright's actions. Instead, she argues defendants are liable because of their own actions in adopting and maintaining a practice, custom or policy of reckless indifference to instances of known or suspected sexual abuse of students by teachers, in concealing complaints of abuse, and in discouraging students' complaints about such conduct. She argues that these practices, customs or policies created a climate which, at a minimum, facilitated sexual abuse of students by teachers in general, and that there was a causal relationship between these practices, customs or policies and the repeated sexual assaults against her by Wright. Thus, this is not respondeat superior in another guise, but an assertion of liability against the individual defendants based on theories recognized in a line of Supreme Court cases.
 
 
 17
 Nothing in DeShaney suggests that state officials may escape liability arising from their policies maintained in deliberate indifference to actions taken by their subordinates. As the Supreme Court recently reconfirmed in City of Canton v. Harris, --- U.S. ----, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989), a municipality may be liable under section 1983 where its policymakers made "a deliberate choice to follow a course of action ... from among various alternatives," (quoting Pembauer v. Cincinnati, 475 U.S. 469, 483-84, 106 S.Ct. 1292, 1300-01, 89 L.Ed.2d 452 (1986) (plurality op.)), and the policy chosen "reflects deliberate indifference to the constitutional rights of [the city's] inhabitants," 109 S.Ct. at 1206. See also Monell, 436 U.S. at 690-91, 98 S.Ct. at 2036-37 (government body may be sued for constitutional deprivations visited pursuant to governmental "custom", "practices" or "usage").
 
 
 18
 This is an independent basis for liability previously pled and preserved by Stoneking which is unrelated to the issue decided in DeShaney. Liability of municipal policymakers for policies or customs chosen or recklessly maintained is not dependent upon the existence of a "special relationship" between the municipal officials and the individuals harmed. See Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir.1989), petition for cert. filed, 57 U.S.L.W. 3843 (U.S. June 18, 1989) (No. 88-2036) (liability against police chief and mayor for unauthorized action of police officers in forcing entry into bar and beating patrons based on the police officials' constructive knowledge of custom and deficient policies in recruitment and training).
 
 
 19
 Thus, to the extent that the Supreme Court's remand of this case in light of DeShaney required us to consider whether Stoneking still may maintain a viable section 1983 claim if there is no predicate duty by defendants to protect her, we hold that she may because she has also alleged that defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused her constitutional harm.
 
 III.
 
 20
 Defendants argue that Wright cannot be considered to have been acting pursuant to any School District policy and that it is outlandish and scandalous of Stoneking to suggest "that the school officials actually wanted and encouraged teachers to sexually abuse their students." Appellants' Supplemental Brief on Remand at 25. Stoneking did not, and need not, so suggest. As the Supreme Court stated in Canton, "[i]t may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees." 109 S.Ct. at 1205. Nonetheless, it continued, if the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, "the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. It continued, "[i]n that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." Id.
 
 
 21
 In any event, appellants' argument that there was no policy, custom or practice is a merits issue, which we cannot resolve on this interlocutory appeal. If there are contested issues of material fact, they must go to the jury. See Mitchell v. Forsyth, 472 U.S. 511, 527, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) ("claim of immunity is conceptually distinct from the merits of the plaintiff's claim"); Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980) ("The issue of authorization, approval or encouragement is generally one of fact, not law."). As we suggested in Chinchello v. Fenton, 805 F.2d 126, 130-31 (3d Cir.1986), the denial of a motion for summary judgment claiming qualified immunity based on the "I didn't do it" defense will not be immediately appealable under Mitchell. Nonetheless, we believe that we must decide whether Stoneking has produced evidence sufficient to create a material issue of fact about the existence of a custom, practice or policy of deliberate indifference to misconduct by teachers, since that is directly related to the "fact-specific" inquiry into the qualified immunity defense asserted by defendants. Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).
 
 IV.
 
 22
 The principles applicable to defendants' assertion of qualified immunity have not changed to any significant degree since our opinion in Stoneking I. It is the defendants' burden to establish that they are entitled to such immunity. Ryan v. Burlington County, 860 F.2d 1199, 1204 n. 9 (3d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989). The defendants must show that their conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).
 
 
 23
 Under the test announced in Harlow, reasonableness is measured by an objective standard; arguments that the defendants desired to handle or subjectively believed that they had handled the incidents properly are irrelevant. Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The defendants are entitled to qualified immunity if reasonable officials in the defendants' position at the relevant time could have believed, in light of clearly established law, that their conduct comported with established legal standards. See id., 107 S.Ct. at 3039.
 
 
 24
 Harlow explicitly chose not to discuss the question of how to evaluate the " 'state of the law' " during prior periods, leaving this issue to the lower courts. See 457 U.S. at 818 n. 32, 102 S.Ct. at 2738 n. 32 (citation omitted). This court does not require "relatively strict factual identity" between applicable precedent and the case at issue. People of Three Mile Island v. Nuclear Regulatory Comm., 747 F.2d 139, 144 (3d Cir.1984). "[S]ome but not precise factual correspondence" to precedent would be required. Id.; see also Anderson, 483 U.S. at 640, 107 S.Ct. at 3039.
 
 
 25
 We expect officials to "apply general, well-developed legal principles." People of Three Mile Island, 747 F.2d at 144. We have explained that we have "adopted a broad view of what constitutes an established right of which a reasonable person would have known," Sourbeer v. Robinson, 791 F.2d 1094, 1103 (3d Cir.1986), cert. denied, 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987), which requires us to undertake "an inquiry into the general legal principles governing analogous factual situations, if any, and a subsequent determination whether the official should have related this established law to the instant situation." Hicks v. Feeney, 770 F.2d 375, 380 (3d Cir.1985).
 
 
 26
 It may seem ludicrous to be obliged to consider whether it was "clearly established" that it was impermissible for school teachers and staff to sexually molest students. Nonetheless, we construe the proper inquiry as whether it was established that the students' rights were constitutionally based. Applying this standard, we reiterate the conclusion we reached in Stoneking I that the constitutional right Stoneking alleges, to freedom from invasion of her personal security through sexual abuse, was well-established at the time the assaults upon her occurred. The Supreme Court in considering the closely analogous right implicated by corporal punishment in schools, held that "[a]mong the historic liberties ... protected [by the Due Process Clause] was a right to be free from ... unjustified intrusions on personal security." Ingraham v. Wright, 430 U.S. 651, 673 & n. 41, 97 S.Ct. 1401, 1413 & n. 41, 51 L.Ed.2d 711 (1977).[2] See also Black v. Stephens, 662 F.2d 181, 188 (3d Cir.1981), cert. denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982) ("[a] law enforcement officer's infliction of personal injury on a person ... may deprive a victim of a fourteenth amendment 'liberty' "); Curtis v. Everette, 489 F.2d 516, 518-19 (3d Cir.1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974) (prisoner's liberty interest implicated in assault by fellow prisoner).
 
 
 27
 A teacher's sexual molestation of a student is an intrusion of the schoolchild's bodily integrity not substantively different for constitutional purposes from corporal punishment by teachers. Reasonable officials would have understood the "contours" of a student's right to bodily integrity, under the Due Process Clause, to encompass a student's right to be free from sexual assaults by his or her teachers. See Anderson, 483 U.S. at 639-40, 107 S.Ct. at 3037-38 (discussing level of particularity required for definition of clearly established rights).
 
 
 28
 Since a teacher's sexual molestation of a student could not possibly be deemed an acceptable practice, as some view teacher-inflicted corporal punishment, a student's right to be free from such molestation may be viewed as clearly established even before Ingraham. See Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) (substantive due process violation occurs where conduct "shocks the conscience"); cf. Mitchell v. Forsyth, 472 U.S. 511, 534, 105 S.Ct. 2806, 2819, 86 L.Ed.2d 411 (1985) (right against warrantless security wiretaps was not "clearly established" where many successive administrations employed the practice and considered it constitutional).
 
 
 29
 We turn then from the issue of the clearly established constitutional right of Stoneking to be free from sexual abuse by school staff to an inquiry into the objective reasonableness of defendants' conduct from late 1980 through at least 1983 when Stoneking was molested by Wright while still a student. Anderson teaches us that this inquiry into reasonableness requires examination of the information possessed by the defendants. 483 U.S. at 641, 107 S.Ct. at 3039. We set forth some of the evidence in the record because the parties now agree that we are not limited to the allegations of the complaint on which our prior opinion was based. But see Stoneking I, 856 F.2d at 597-98 nn. 5, 6 & 7.
 
 
 30
 According to the deposition testimony of Theresa Rodgers, her social studies teacher Richard DeMarte sexually accosted her in late 1977 or early 1978. See 667 F.Supp. at 1100 (summarizing Rodgers deposition). She immediately reported the incident to Miller and Smith. They responded by warning her that it would be her word against the teacher's and that she should not tell her parents. Id. Although Smith told Rodgers that he would "take care" of the problem, DeMarte's personnel file shows no evidence of any disciplinary action taken against him; to the contrary, his teaching evaluation showed a perfect score. Id.
 
 
 31
 According to the deposition testimony of Judith Grove Sowers, she was sexually assaulted by Wright in 1979 and reported the incident to Miller and Smith. She claims that Smith told her "it was my [Sowers'] fault. That's why he wanted to clear up the rumors because he wanted the band to get back on their feet again.... He had told me that if the rumors were true ... I could find myself in front of a jury, in front of a judge, telling exactly what happened, that being that I had been drinking [and that I was] at his house voluntarily ... I wouldn't look very good is what he said." Id. at 1101 n. 24 (quoting deposition). Miller brought Wright to the office, asked Sowers to repeat her allegation in front of him, and asked Wright if it was true, which Wright denied. Supp.App. at 7 (Sowers deposition).
 
 
 32
 According to the deposition testimony of Sowers' father, who requested a conference with Miller and Sowers about the incident, the defendants attempted to persuade him that no teacher would behave as his daughter alleged. 667 F.Supp. at 1101 (citing deposition testimony). Both Sowers and her father testified that she was presented with the option of recanting her story in front of the band or withdrawing from all band activities. Id. Sowers stated that the band was assembled and she was called before it for this purpose, but fled from the room in tears. Id.
 
 
 33
 As the district court noted, it could be inferred that "the 'forced apology' served as a trump card in the hands of Edward Wright," who could threaten his other victims with similar treatment if they reported his actions, id. at 1101-02, and Stoneking in fact testified that she did not report Wright's assaults because "I knew about Judy Grove and what happened." Supp. App. at 16.
 
 
 34
 Smith's handwritten notes refer to three other incidents in 1981-1982 with respect to sexual harassment by DeMarte, the social studies teacher. In 1981, Lori Tsepelis complained to Miller and Smith that DeMarte had kissed her on the back of the neck several times while she was taking a make-up test. See Transcript of Deposition of Smith at 70-83. Ms. Tsepelis' parents also complained. Id. at 84-85. DeMarte admitted one kiss, explaining "that he had kissed her on the cheek as a thank you for her having brought food to him at the radio station on two occasions in November." Id. at 74. Smith conceded that when a teacher kisses a student it is generally a sexual advance, id. at 91, but Smith and Miller merely arranged that Ms. Tsepelis would, for the remainder of the semester, pick up her homework from DeMarte via Miller and that she would not be scheduled for DeMarte's class in the future. Although Smith told DeMarte "he had not used good judgment in having [Ms. Tsepelis] alone in the room," id. at 93, he placed no discipline report in DeMarte's file.
 
 
 35
 Two months later, two female students reported to Miller that another student, Lorie Lamberson, was crying in the restroom and when she emerged she told Smith and Miller that she had gone to DeMarte's room with a friend to get a make-up assignment, that he sent her friend away, blindfolded her to demonstrate the sense of touch, and after doing so was down on his hands and knees looking up her dress. The student was so distraught that she was sent to the nurse's office and then told to contact her parents. Id. at 99-106. When she spoke to her mother, she stated " 'that she had a problem like Lori Tsepelis.' " Id. at 110. Although Smith testified that he subjectively believed Ms. Tsepelis' story, his own notes state that " 'before sending [Ms. Lamberson] home I brought up the fact that she and her mother were aware of the incident with Mr. DeMarte and Lori Tsepelis prior to today and hoped that she wasn't involved in framing Mr. DeMarte.' " Id. at 112 (emphasis added). DeMarte admitted the incident except for the complaint that he had looked up Ms. Lamberson's dress. Nonetheless, Smith's notes continue, " 'I also pointed out that it was her word against [DeMarte's] and that Mr. Miller and I would have to judge from that.' " Id. at 115. Again, the only action taken was to arrange that the student be scheduled for a different class, id. at 119, and no reprimand or other note was placed in DeMarte's file.
 
 
 36
 The next year, another parent called to complain about DeMarte's relationship with a student because DeMarte had asked the student to sit on his lap at a Halloween party on a social occasion, see id. at 151-53, and again no written warning was placed in DeMarte's file. Id. at 160.
 
 
 37
 In sum, there is evidence in the record that between 1978 and 1982 Smith and Miller received at least five complaints about sexual assaults of female students by teachers and staff members; that Shuey was told about some of these complaints; that Smith recorded these and other allegations in a secret file at home rather than in the teachers' personnel files, which a jury could view as active concealment; that the defendants gave such teachers excellent performance evaluations, which a jury could view as communication by the defendants to the teachers that the conduct of which they were accused would not be considered to reflect negatively on them; and that Smith and Miller discouraged and/or intimidated students and parents from pursuing complaints, on one occasion by forcing a student to publicly recant her allegation.
 
 
 38
 For this purpose, the fact that Stoneking did not complain to the defendants about Wright's molestation of her is not dispositive. See Ryan v. Burlington County, 860 F.2d at 1206-07 (prison officials not entitled to qualified immunity because, under the "reasonable official" standard, they should have known their actions were unconstitutional based on their general knowledge of the overcrowded prison conditions). Although Stoneking's failure to complain may be relevant at trial to her credibility or the causation issue, see id. at 1209, for qualified immunity purposes it is sufficient that there is adequate evidence that defendants were on notice of complaints of sexual harassment of students by teachers and staff at the school.
 
 
 39
 In their brief, defendants correctly state that "[i]n determining whether or not a public official is entitled to a defense of qualified immunity, one must identify legal principles governing analogous factual situations at the time the alleged constitutional violation occurred, and if any existed, determine whether the public officials should have related this established law to the situation before them." Appellants' Supp. Brief at 26.
 
 
 40
 After Monell had established that government officials could be held liable for policies and practices which they established and maintained, this court held in two cases in 1981 that public officials in administrative positions with notice of assaultive behavior by their subordinates must not take actions which communicate that they encourage or even condone such behavior.
 
 
 41
 In Commonwealth v. Porter, 659 F.2d 306, 309 (3d Cir.1981) (in banc), cert. denied, 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982), we considered the appeal of a chief of police and mayor who had been found liable by the district court for "engag[ing] in an extended pattern or practice of conduct denying persons lawfully in [the borough] their constitutional rights to be free from physical violence, mistreatment, threats, harassment...." The physical violence had been inflicted by only one officer in the department, not by these two defendants. Instead, the charges against the police chief, much like those Stoneking raises against the defendants here, were that he received complaints about the conduct of the officer but took no steps to suspend, transfer or otherwise limit the officer's activities; publicly condoned the actions of the officer; and attempted to intimidate persons who complained about his conduct. Id. at 310. Similarly, the charges against the mayor stemmed from the fact that he received numerous complaints; carried out only perfunctory investigations, consisting merely " 'of asking [the chief and the officer] whether there was any basis for the complaint' "; defended the officer publicly; and retaliated against officers who complained. Id. at 311 (quoting Commonwealth v. Porter, 480 F.Supp. 686, 702 (W.D.Pa.1979)).
 
 
 42
 In the opinion of the majority affirming the district court's findings that the pattern of support shown by the police chief and mayor for the offending policeman amounted " 'to a custom and usage under 42 U.S.C. Sec. 1983 and Monell,' " id. at 312 (quoting Porter, 480 F.Supp. at 703 (W.D.Pa.1979)), for which they could be held liable, we stated that Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), "requires that we focus on the degree to which [the] Chief ... participated in a pattern of violation by virtue of knowledge, acquiescence, support and encouragement." 659 F.2d at 321. A different majority found no basis for liability as to the Borough Council because the evidence as to it consisted primarily of failure to investigate complaints and passage of resolutions supporting the policemen, which was insufficient to establish a pattern or plan. "[N]o more than inaction and insensitivity" had been shown, which did not establish the requisite causal link under Rizzo v. Goode. Id. at 336-37.
 
 
 43
 Porter demonstrates clearly that by 1981 an administrator's policy of curtailing investigation of complaints brought to the administrator's attention, intimidation of complainants, and/or defense of subordinates charged with misconduct was sufficient to constitute a custom or practice under Monell.
 
 
 44
 Again in 1981, we held that a jury was entitled to hold a city and its chief of police liable for adopting a policy which postponed disciplinary investigation of an officer against whom a complaint was lodged until after resolution of any arrest charge stemming from the incident. Black v. Stephens, 662 F.2d 181 (3d Cir.1981), cert. denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). We found that this policy could be construed to encourage officers to bring charges against citizens who accused the police of misconduct, and that proximate causation could be established on this basis. We also held that the chief of police could be held liable for the promulgation and implementation of a policy which "encouraged the use of excessive force by the officers within the department." Id. at 183, 189-91.
 
 
 45
 Our holdings were consistent with those reached earlier by other courts of appeals. See, e.g., McClelland v. Facteau, 610 F.2d 693, 697-98 (10th Cir.1979) (police chiefs may be held liable for failure to correct misconduct of which they have notice); Sims v. Adams, 537 F.2d 829, 832 (5th Cir.1976) (complaint stated cause of action against mayor and chief of police for failure to control police officer's propensity for violence); Turpin v. Mailet, 579 F.2d 152, 167-68 (2d Cir.1978) (en banc) (city could be liable under the Fourteenth Amendment for encouraging animosity among police officers against plaintiff which led them to believe that they could violate his civil rights with impunity), vacated in light of Monell, 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978), reinstated, 591 F.2d 426 (2d Cir.1979) (per curiam) (case reinstated on same theory but under Sec. 1983 in light of Monell ), judgment for plaintiff reversed, 619 F.2d 196, 202 (2d Cir.) (plaintiff failed to prove official policy where "there was no evidence of a prior pattern or practice of harassment"), cert. denied, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980).
 
 
 46
 In sum, although the mere failure of supervisory officials to act or investigate cannot be the basis of liability, see Chinchello v. Fenton, 805 F.2d 126, 133-34 (3d Cir.1986), by at least 1981 when this court's cases in Porter and Black were decided (both incidentally arising, as this case does, in the Western District of Pennsylvania), it was clearly established law that such officials may not with impunity maintain a custom, practice or usage that communicated condonation or authorization of assaultive behavior.
 
 
 47
 If the testimony of the various complainants is believed, Smith and Miller discouraged and minimized reports of sexual misconduct by teachers. A jury could construe such actions, as plaintiff's expert did, as "encourag[ing] a climate to flourish where innocent girls were victimized." Affidavit of Chet Kent, App. at 55. Judge Stapleton in his dissent argues that under the law as it existed at the relevant time, "qualified immunity could be denied only if the circumstances were such that a reasonable school administrator would have realized he was communicating his approval to the offending teacher." Dissent at 732. Although that may seem a farfetched possibility, there is enough in this record from Smith and Miller's suggestion to Ms. Lamberson about "framing" DeMarte and their statement that it was "her word against his," as well as from the forced apology by Judy Grove Sowers about her allegations of Wright's sexual harassment, that a jury could reasonably conclude that such discouragement of complaints amounted to a communication of condonation of the teacher's behavior. Thus, Stoneking has asserted a sufficiently tenable theory that there was an "affirmative link," see Rizzo v. Goode, 423 U.S. at 371, 96 S.Ct. at 604, between her injury and the policies and practices that Smith and Miller employed and affirmative acts they took in furtherance of them to make this a jury issue.
 
 
 48
 We are cognizant that defendants deny many of these allegations, and assert that they imposed an adequate policy to deal with Stoneking's allegations against Wright by ordering Wright "never to get into a 'one on one' situation with female students again." Appellants' Supplemental Brief at 4. Whether there was an adequate policy and whether their other defenses have merit will be up to the jury.
 
 
 49
 On the other hand, we must conclude, in light of our precedent, that Stoneking's claims against Shuey amount to mere "inaction and insensitivity" on his part. See Porter, 659 F.2d at 337. We cannot discern from the record any affirmative acts by Shuey on which Stoneking can base a claim of toleration, condonation or encouragement of sexual harassment by teachers which occurred in one of the various schools within his district.
 
 
 50
 For the foregoing reasons, we conclude that the district court did not err in denying the motion for summary judgment of defendants Smith and Miller on grounds of qualified immunity, but we conclude that Shuey's motion should have been granted.
 
 V.
 
 51
 As we have alluded to previously, trial of this case has been pending in the district court for a substantial period of time while the qualified immunity issue has been litigated. Our conclusion that Smith and Miller are not entitled to qualified immunity as a matter of law in their individual capacities is not in any way suggestive of any view on the merits of Stoneking's claim against them personally or against all of the defendants in their official capacities as to which no qualified immunity can be asserted. Thus, we are hopeful that upon remand this case can proceed to an expeditious conclusion.
 
 
 52
 For the reasons set forth above, we will affirm the district court's denial of the motion for summary judgment as to Smith and Miller on the grounds of qualified immunity, and we will vacate the district court's order denying the motion for qualified immunity as to Shuey in his individual capacity, and remand with directions that his motion be granted.
 
 
 53
 Costs on appeal are to be borne by appellants Smith and Miller.
 
 
 54
 STAPLETON, Circuit Judge, concurring in part and dissenting in part:
 
 
 55
 After DeShaney, Ms. Stoneking's contention that the defendants owed her a well-established constitutionally based duty to protect her from Mr. Wright is no longer tenable. I agree with the court, however, that she alleges an alternative and distinct theory of liability that is not rejected in DeShaney. The issue for decision is whether the defendants have qualified immunity with respect to any damage liability that might be imposed upon them individually on that theory. The court concludes that Superintendent Shuey is entitled to immunity and I agree. I dissent, however, from the court's denial of immunity to Principal Smith and Assistant Principal Miller. Under Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) and Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the relevant issue is whether reasonable school officials with the knowledge allegedly possessed by the defendants would have realized during the period from 1980 to 1983 that they were violating a well-established duty that they owed to Ms. Stoneking under federal statutory or constitutional law. That issue must be resolved by looking to the pre-1983 case law dealing with the circumstances under which a supervisor can be held liable for the constitutional tort of someone he or she supervises. As I read that case law[1], the only well-established duty imposed upon a supervisor by federal law was the duty to refrain from affirmative encouragement of the offending conduct. Accordingly, unless the complaint alleges such encouragement and unless Ms. Stoneking, after the filing of the motion for summary judgment, pointed to competent evidence from which a fact finder could find such encouragement, the defendants are entitled to immunity.
 
 
 56
 In Commonwealth of Penn. v. Porter, 659 F.2d 306 (3d Cir.1981), this court, ruling on Police Chief Porter's liability, held that "encouragement" was a prerequisite to liability. We there stated that Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), "require[d] that we focus on the degree to which Chief Porter participated in a pattern of violation by virtue of knowledge, acquiescence, support and encouragement." 659 F.2d at 321 (emphasis added). We then cited the Chief's "active[ ] support" of the constitutional tortfeasor, and the "affirmative steps" he took to impede legal action against the subordinate. Id. at 322. As to the Mayor, the Porter court found that he had been "affirmatively involve[d]" with the constitutional tortfeasor and "strongly support[ed]" him. Id.
 
 
 57
 Porter's conclusions on this matter were reiterated in Black v. Stephens, 662 F.2d 181, 191 (3d Cir.1981). In Black, this court stated that the evidence supported the jury's finding "of the encouragement and support required to hold the [police chief] liable under section 1983." (emphasis added). Finally, in Chinchello v. Fenton, 805 F.2d 126 (3d Cir.1986), we first acknowledged that a plaintiff might have an easier time proving supervisory liability in other circuits than in ours. We then reviewed Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) and its progeny and concluded that supervisory liability could be found only where the official had both "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents" and where there were "circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." 805 F.2d at 133 (emphasis added).
 
 
 58
 Under these cases, I am unable to say that a reasonable school administrator would understand that he would violate the well-established constitutional rights of students by failing to pursue a complaint of sexual abuse by a teacher with sufficient aggressiveness or even by discouraging such complaints. Under the law as it then existed, qualified immunity could be denied only if the circumstances were such that a reasonable school administrator would have realized he was communicating his approval to the offending teacher.
 
 
 59
 I acknowledge that in some contexts failures to discipline teachers shown to have misbehaved and discouragement of complaints about misbehaving teachers might conceivably be a part of a pattern of conduct that would communicate approval by the administration. However, where the misconduct at issue is sexual abuse of high school students and where the administrator has expressly instructed the offending teacher never again to be alone with a female student, it would take a lot more than this record contains to permit a fact finder to conclude that Wright understood the administration to favor his misdeeds.
 
 
 60
 Because Ms. Stoneking has neither alleged nor shown evidence of affirmative encouragement of Wright's conduct by the individual defendants, I would hold that all three are entitled to immunity.
 
 
 
 [1]
 Appellants argue that the fact that the Supreme Court has remanded this case for reconsideration in light of DeShaney "strongly suggest[s]" that DeShaney is indistinguishable and controls the outcome of this case. Appellants' Supplemental Brief on Remand at 8. We know of no authority for the proposition that a direction that we give "further consideration" to a case is in effect a direction as to the outcome. If the Supreme Court wished to direct an outcome, we are confident that it would have so stated
 
 
 [2]
 By 1980, this circuit had invoked Ingraham v. Wright in varied contexts. See, e.g., Romeo v. Youngberg, 644 F.2d 147 (3d Cir.1980) (in banc) (right of mentally retarded to freedom from assault in state institution), vacated on other grounds, 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982) (but agreeing with court's application of Ingraham); Halderman v. Pennhurst State School and Hospital, 612 F.2d 84, 98 (3d Cir.1979) (in banc), rev'd, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); United States ex. rel. Caruso v. United States Board of Parole, 570 F.2d 1150, 1157 (3d Cir.), cert. denied, 436 U.S. 911, 98 S.Ct. 2249, 56 L.Ed.2d 411 (1978) (considering parole revocation challenge; noting that liberty for due process purposes extends to "[p]ersonal security from physical violence")
 
 
 [1]
 The state of the law after City of Canton v. Harris, --- U.S. ----, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), is simply not relevant to the issue presented by this appeal