G. Douglas Jones, Thomas W. Bowron, II, Amy E. Gallimore, Jones Bowron & Selden, PC, Birmingham, AL, for plaintiff.

Ralph D. Gaines, Jr., Gaines Gaines Gaines & Rasco, PC, Talladega, AL, for defendants.

James E. THROWER, Sr., individually and as next friend of his minor son, P.J. Thrower, Plaintiff,

v.

Dr. Edison Daniel BARNEY, et al., Defendants.

Civ. A. No. 94–AR–0041–E.

United States District Court, N.D. Alabama, Eastern Division.

March 30, 1994.

### MEMORANDUM OPINION

ACKER, District Judge.

P.J. Thrower, a minor, sues by his next friend and father, James E. Thrower, Sr., who claims that defendant Edison Daniel Barney, superintendent of the Talladega City schools, defendant Joyce Hutchinson, principal of Zora Ellis Middle School, and defendant Mike Dick, assistant principal, while acting under color of state law, deprived P.J. of federal constitutional rights in violation of 42 U.S.C. § 1983. The complaint appends state tort claims based on the same factual allegations upon which the § 1983 claims are based.

The constitutional tort allegedly committed by Dick was that he suspended P.J. for two days without giving his parents notice of the suspension. While under suspension and not being properly supervised, P.J. was acciden-

tally wounded by a gunshot. The theory against Dick is that his failure to notify the parents constituted such a gross disregard for P.J.'s safety as to amount to a denial of substantive due process. The § 1983 theory against Hutchinson and Barney is that they tolerated such suspensions without notice to parents, and therefore, although not liable under § 1983 on a *respondeat superior* theory, they are liable because of their constitutionally defective policy.

Defendants are sued only in their individual capacities. If there is any dispute over the circumstances surrounding the suspension itself, there is no allegation of a denial of procedural due process. Therefore, insofar as the "due process" claim is concerned, it only involves substantive due process. Although the complaint mentions, alternatively, a denial of "equal protection," the "equal protection" claim has conspicuously not been pursued and should have never been made in the first place because there is no allegation and no evidence whatsoever to suggest that any of the defendants treated P.J. disparately because of his membership in any suspect or protected class.

■ By order entered on February 1, 1994, this court reminded the parties that the Federal Rules of Civil Procedure, as amended effective December 1, 1993 (in particular Rules 16 and 26), are applicable. Despite this, the report required by Rule 26(f), F.R.Civ.P., has not been filed. The amended rules contemplate that no discovery shall be undertaken until after the parties meet and confer. However, the rules do not stand in the way of the filing of a motion to dismiss or of a motion for summary judgment before discovery. The court now has for consideration defendants' alternative motion to dismiss or for summary judgment. With no discovery, the only evidentiary materials offered by plaintiff or by defendants are affidavits. Plaintiff has attached his affidavits to his brief submitted in opposition to defendants' motion for summary judgment. They would not have been a matter of record except for the court's instruction to the Clerk to file both the brief and the affidavits. In addition to his brief, plaintiff filed a motion for an extension of time within which to file a proposed affidavit from an expert witness who is supposed to criticize the suspension and supervision procedures followed by defendants in P.J.'s case. Because the said motion has been overruled, defendants' Rule 56 motion is now under submission. Plaintiff's motion for an extension was overruled for two reasons. First, it could and should have been filed earlier. Second, and more importantly, if an "expert" can state the contemplated opinion that what defendants did constituted poor or improper school administration, this court's disposition of the case under Rule 56 would not be affected.

If the court were considering this complaint under the scrutiny of Rule 12(b)(6) instead of Rule 56, the court would assume the factual averments of the complaint to be true. However, because the court is only examining this complaint under Rule 56, the non-movant cannot simply rely on his pleadings. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under *Celotex* the court is limited to the factual materials, construed most favorably to the non-movant. It is on this basis that the court will proceed.

### Pertinent Facts Construed Most Favorably to Plaintiff

P.J. was approaching 14 years of age on January 13, 1992. He was compelled by state law to attend school, and under that compulsion he attended Zora Ellis Middle School, a public school at which Hutchinson was principal and Dick was assistant principal under Hutchinson. Barney was superintendent of schools over both Hutchinson and Dick.

On January 13, 1992, P.J. was given a two-day suspension by Dick for leaving the school grounds without permission. P.J. was sent home with a formal suspension notice which he was instructed by Dick to deliver to his parents, both of whom worked and were not at home when the suspension occurred and could not have been reached at home at the time by telephone. P.J.'s grandfather had been designated as the person to contact in the event of a need to reach someone about P.J. during school hours. The grandfather was not contacted by Dick. What efforts were made to contact P.J.'s parents by telephone or otherwise is a matter of dispute. Therefore, for the purposes of Rule 56 con-

sideration the court must assume that there was no effort by Dick or Hutchinson to contact the parents except by sending the notice with P.J., who promptly discarded it and said nothing to his parents about his suspension. Although some of plaintiff's evidence contains the suggestion that P.J. went on the school bus ostensibly to school during his suspension, his mother's affidavit says that she drove him to school not knowing that he had been suspended. The court must assume that the parents were unaware of the suspension until after the accident.

On January 15, 1992, the last day of his suspension and while visiting a friend's house, P.J. was accidentally wounded by a gunshot.

Both on January 13, 1992 and January 15, 1992, the Talladega City schools had a written set of policies which included the following language:

> The parent or guardian shall be notified of the suspension by telephone, if possible. An official notice of the action will be mailed to the parent or guardian within 2 school days of the suspension.

There is no indication in the record that a notice was mailed to the parents either before or after the unfortunate accident which occurred on the second day of the period of suspension. The extent to which this written policy was enforced or observed by school officials is in dispute.

## Conclusions of Law

Plaintiff's brief in opposition to defendants' motion for summary judgment argues:

> The defendants' callous, indifferent, and reckless abandonment from school ground supervision of P.J. Thrower without the remote expectation that P.J. Thrower's parents would be aware of his unsupervised status clearly shocks the conscience....

> \*　　\*　　\*　　\*　　\*　　\*

> Clearly, the suspension of P.J., for a minor, non-disruptive offense could have been effectively. and officially accomplished while insuring that some supervision would be available for the child, thus bringing the interest of the school and the rights of P.J. Thrower into balance.

> \*　　\*　　\*　　\*　　\*　　\*

> Said policy [failing to require actual parental notification] was grossly deficient in that it relieved the school from supervising and protecting minor aged students, and also effectively and foreseeably prevented James Thrower or any other guardian from exercising reasonable supervision and protection over his minor child during compulsory school hours, as to constitute a repudiation of those rights guaranteed by the Constitution.

Defendants assert the defense of qualified immunity. The court agrees with defendants that they, as a matter of mixed fact and law, do enjoy qualified immunity on the facts construed most favorably to plaintiff, and are therefore immune from the claims made pursuant to § 1983. Because this disposition causes the federal question jurisdiction of this court under 28 U.S.C. § 1331 to disappear, the state law claims, if they have any merit, are due to be dismissed without prejudice.

■ In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court made it clear that a person cannot be found personally liable under § 1983 for his actions performed under color of state law even if they deprive another of a federally protected right, unless the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." 483 U.S. at 639, 107 S.Ct. at 3039. Plaintiff has not pointed to any decision, whether binding or persuasive, which on January 13, 1992, would have put these particular defendants firmly on notice of a constitutional right held by P.J. under the "due process" clause guaranteeing P.J. supervision or protection after being suspended and after leaving the school grounds, or guaranteeing notice to his parents of the suspension.

The "equal protection" claim was totally devoid of merit from the start and would have been dismissed under Rule 12(b)(6). No defendant is alleged to have treated P.J. unequally with any invidiously discriminatory motivation.

Courts are quite aware that school officials do not read the advance sheets and do not attend CLE seminars on the evolving Four-

**1448**

teenth Amendment. Reasonably prudent school officials cannot be expected to be constitutional lawyers, but if these particular defendants were motivated to keep up with the legal literature on the subject of their constitutional obligations to students, they might read, *inter alia*, the following authorities:

*J.O. v. Alton Community Unit School Dist. 11*, 909 F.2d 267 (7th Cir.1990)

*J.O.* involved Illinois school authorities who were charged under § 1983 with violating substantive due process by failing to prevent alleged sexual abuse of school children in their charge. The Seventh Circuit held:

> Unfortunately for the plaintiffs, the due process clause is not "a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). Both this court and the Supreme Court have repeatedly rejected attempts to read the fourteenth amendment's due process clause as an affirmative charter of governmental duties. *See, e.g., id.* at 197, 109 S.Ct. at 1004–07, *Archie v. City of Racine*, 847 F.2d 1211, 1220–23 (7th Cir.1988), *cert. denied*, [489] U.S. [1065], 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989). Only where the state has exercised its power so as to render an individual unable to care for himself or herself may an affirmative duty to protect that individual arise. *DeShaney*, 489 U.S. at 198–02, 109 S.Ct. at 1005–06. But beyond the case of incarcerated prisoners and involuntarily committed mental patients, the Supreme Court has never recognized such a duty. *See Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (mental patients); *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (prisoners).
>
> We do not suggest that prisoners and mental patients are an exhaustive list of all persons to whom the state owes some affirmative duties, but the government, acting through local school administrations, has not rendered its schoolchildren so helpless that an affirmative constitutional duty to protect arises. Whatever duty of protection does arise is best left to laws outside the Constitution, as Illinois has done. *See, e.g., Eversole v. Wasson*, 80 Ill.App.3d 94,

398 N.E.2d 1246, 35 Ill.Dec. 296 (1980) (recognizing student's tort suit against school district for injuries inflicted in a teacher's assault).

> The state's custody over their person is the most distinguishing characteristic in the cases of the mental patient and the prisoner; these people are unable to provide for basic human needs like food, clothing, shelter, medical care, and reasonable safety. *See DeShaney*, 489 U.S. at 198–100, 109 S.Ct. at 1005. At most, the state might require a child to attend school, see ILL.REV.STAT. ch. 122, ¶ 26–2, but it cannot be suggested that compulsory school attendance makes a child unable to care for basic human needs. The parents still retain primary responsibility for feeding, clothing, sheltering, and caring for the child. By mandating school attendance for children under the age of sixteen, the state of Illinois has not assumed responsibility for their entire personal lives; these children and their parents retain substantial freedom to act. The analogy of a school yard to a prison may be a popular one for school-age children, but we cannot recognize constitutional duties on a child's lament. Schoolchildren are not like mental patients and prisoners such that the state has an affirmative duty to protect them.

909 F.2d at 272–73.

### D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364 (3rd Cr.1992)

The Third Circuit in *D.R.* reviewed a district court's finding that school officials were entitled to qualified immunity in a § 1983 case and affirmed. As in *D.R.* the issue arose from alleged physical and sexual abuse proximately resulting from an alleged failure to properly supervise. The Third Circuit majority, in this *en banc* opinion, handled the problem as follows:

> In *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Court declined to impose a constitutional duty upon a state to protect the life, liberty or property of a citizen from deprivations by private actors absent the existence of a

special relationship. *DeShaney* involved the state's repeated receipt of reports of abuse of a minor by his father. Notwithstanding the notice provided by the reports to the state agency, it did not remove the child from his father's custody. The father subsequently beat the child resulting in permanent brain damage. The child and his mother filed a § 1983 action against state officials claiming that they deprived the minor of his liberty in violation of the Fourteenth Amendment "by failing to protect him against a risk of violence at his father's hands of which they knew or should have known." *DeShaney,* 489 U.S. at 193, 109 S.Ct. at 1002.

After stating the general rule that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," *id.* at 197, 109 S.Ct. at 1004, the Court went on to acknowledge that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney* at 198, 109 S.Ct. at 1004–05. The Court noted that it first recognized such an exception in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Court in *Estelle* held that the state had an affirmative duty to provide adequate medical care for prisoners since incarceration prevents an inmate from caring for himself. *Id.* at 103–04, 97 S.Ct. at 290–91.

\*   \*   \*   \*   \*   \*

Plaintiffs assert that Pennsylvania's scheme of compulsory attendance and the school defendants' exercise of *in loco parentis* authority over their pupils so restrain school children's liberty that plaintiffs can be considered to have been in state "custody" during school hours for Fourteenth Amendment purposes. We consider this to be an open question in this circuit. *See Stoneking v. Bradford Area School District,* 882 F.2d 720, 724 (3d Cir.1989).

\*   \*   \*   \*   \*   \*

Our view that parents remain the primary caretakers, despite their presence in school, is not affected by section 13–1317 which grants Pennsylvania teachers and principals *in loco parentis* status. Section 13–1317 operates in conjunction with section 5–510. Together they permit school boards to set reasonable regulations to govern students' conduct. Pa.Stat.Ann.tit. 24 § 5–510 (1962 & Supp.1991). However, section 13–1317 invests in school officials "only such control as is reasonably necessary to prevent infractions of discipline and interference with the educational process." *Axtell v. Lapenna,* 323 F.Supp. 1077 (W.D.Pa.1971).

By requiring D.R. to attend assigned classes at Middle Bucks as part of her high school educational program, and authorizing officials to engage in disciplinary control over the students, the school defendants did not restrict D.R.'s freedom to the extent that she was prevented from meeting her basic needs. *See Fialkowski [v. Greenwich Home for Children,]* 921 F.2d at [459], 465–66 [ (3rd Cir.1990) ] (mentally retarded adult's liberty not restrained by state where "the Fialkowskis were free to remove their son from [the state institution] if they wished [and] Walter Fialkowski himself enjoyed considerable freedom of movement.") Thus, the school defendants' authority over D.R. during the school day cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in *DeShaney,* particularly when their channels for outside communication were not totally closed.

The analogy between school children and prisoners or the involuntarily committed is weakened further by the fact that school children remain resident in their homes. Thus, they may turn to persons unrelated to the state for help on a daily basis. D.R.'s complaint alleges an ongoing series of assaults and abuse over a period of months. Although these acts allegedly took place during the school day, *D.R. could, and did, leave the school building every day.* The state did nothing to restrict her liberty after school hours and thus did not deny her meaningful access to sources of help.

\*   \*   \*   \*   \*   \*

Our position that no special relationship based upon a restraint of liberty exists here is in accord with the only other appellate case to directly confront this issue to date. In *J.O. v. Alton Community Unit*

*School Dist. 11*, 909 F.2d 267 (7th Cir. 1990), the Court of Appeals for the Seventh Circuit found that compulsory attendance laws did not liken school children to prisoners and the involuntarily committed, both of whom are unable to provide for their own basic human needs. Instead, the Seventh Circuit determined that parents have primary responsibility to provide for the basic needs of their children and that both school children and parents "retain substantial freedom to act." *Id.* at 272.

No one could help but be shocked by the factual allegations in this case. But in *DeShaney* the Supreme Court rejected the "shock the conscience" test of *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), as a standard for imposing § 1983 liability. To do otherwise would readily convert much tortious conduct into constitutional violations at the expense of a decent regard for federalism. While the line is certainly blurred, we are not prepared to say that the conduct charged to the school defendants here crossed the line.

*Id.* at 1369, 1370, 1371, 1372, 1373, 1377 (emphasis supplied). The fact that there was a dissent in *D.R.* hardly constitutes notice of a clear constitutional right of the kind plaintiff here contends for. If a school official is not required to protect students from fellow students within the school building, surely a school official is not required to protect a student from a fellow student, or from a nonstudent, while the student is off the school ground, for whatever reason. For instance, what if this accident had happened while P.J. was absent from school without permission, the very reason for his suspension? Arguably, the suspension constituted a realistic effort to keep P.J. under supervision. If any one of these defendants had locked P.J. up after his suspension for the purpose of protecting him from all possible third-party harm, they would have subjected themselves to a real § 1983 claim, namely, unlawful arrest.

*Russell by Russell v. Fannin County School Dist.*, 784 F.Supp. 1576 (N.D.Ga.1992)

Chief Judge O'Kelley of the Northern District of Georgia in *Russell*, a well-reasoned opinion, found no duty under the Fourteenth Amendment upon school officials to provide substantive due process in the form of protecting a student from third-party violence, that is, unless the said officials had reason to believe that the student is in imminent danger. There is not a shred of evidence offered here by plaintiff to prove that any one of these defendants had reason to believe that P.J. was in imminent danger. After all, plaintiff himself alleges that the shooting was accidental. If in today's world all students are deemed to be in imminent danger by virtue of their being required to attend school, or required to go home, then school officials cannot reasonably be expected personally to bear the burden of compensating students for the natural consequences of that danger under some expanded § 1983 theory.

Had defendants read *J.O., D.R.* or *Russell*, or other cases like them, just before Dick sent P.J. home, they would not have received from them any dire warning that what they were about to do constituted a violation of the Constitution of the United States. In fact, even if defendants had gone to the trouble and expense of seeking the advice of a constitutional scholar before sending P.J. home, and the constitutional scholar had punched Westlaw or Lexis, cases like these three would have popped up. The fact, if it is a fact, that defendants, or any of them, may have been guilty of garden variety Alabama negligence or even wantonness that contributed to P.J.'s injury, does not form a basis for redescribing what happened as a constitutional tort.

Further, the fact that Westlaw or Lexis might have also produced citations which arguably suggest a constitutional duty along the lines here proposed by plaintiff (although distinguishable) cannot lead this court to the conclusion that a reasonable school official should have intuited and followed a new trend instead of subscribing to the reasoning of *J.O., D.R.* or *Russell*.

A recognized principle of the criminal law is that ignorance of the law is no excuse. But *reasonable ignorance of the law is an excuse* when qualified immunity is asserted as a defense under *Anderson v. Creighton* and the Eleventh Circuit jurisprudence

which follows it. And in this case, even if defendants had been highly sophisticated (and they are not deemed to be ignorant), they would have been fully constitutionally justified in what they did. This is doubly true for Hutchinson and Barney, who are really being charged here with vicarious liability or guilt from afar. The Talladega schools' written rule or policy which was designed to provide direction for Dick does not appear to be facially defective even under plaintiff's scrutiny and criticism. And, if Dick failed to follow it, there is no proof that he ignored it with the overt or tacit approval of Hutchinson or Barney.

The best that can be said for plaintiff's constitutional argument is that he has an outside chance of getting one or two votes if the issue should ever reach the Supreme Court on its merits instead of on a qualified immunity defense. A Supreme Court justice who would innovate to create the constitutional right which the dissenters in *D.R.* may have found, and which plaintiff claims to exist, could still not find that a reasonable school official should have anticipated his or her avant-garde opinion as a representation of the current, clear state of the law.

An appropriate, separate order will be entered.